# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 25, 2023

Lyle W. Cayce
Clerk

————————

No. 21-10620

————————

United States of America,

*Plaintiff—Appellee*,

*versus*

Caesar Mark Capistrano; Ethel Oyekunle-Bubu;
Wilkinson Oloyede Thomas,

*Defendants—Appellants*.

————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:20-CR-290-4
USDC No. 4:20-CR-290-8
USDC No. 4:20-CR-290-5

————————————————————

Before Higginbotham, Smith, and Engelhardt, *Circuit Judges*.
Patrick E. Higginbotham, *Circuit Judge*:

A jury convicted a medical doctor and two pharmacists of drug-related crimes under the Controlled Substances Act for their roles in a pill-mill operation. We AFFIRM.

No. 21-10620

**I.**

A grand jury indicted Dr. Caesar Capistrano and two pharmacists, Wilkinson Oloyede Thomas and Ethel Oyekunle-Bubu ("Bubu"), (collectively, "Appellants" or "Defendants") for roles in a "pill-mill" operation.[1] Prosecutors charged Appellants with three drug-distribution conspiracies that each spanned from 2011 to 2020.[2] Bubu and Thomas, who both owned pharmacies, were also charged with possession with intent to distribute controlled substances.[3]

While Capistrano is a medical doctor, he also owned multiple clinics. The Government's theory was that he prescribed controlled substances and Bubu and Thomas filled those prescriptions and others, on a host of occasions, for which there was no legitimate medical purpose. The conspiracy involved recruiters coordinating with pill mills and complicit pharmacies to fill unlawful prescriptions for street-level distribution. Recruits posed as patients, getting prescriptions issued in their names in exchange for cash. The recruiters would then fill the recruits' prescriptions at complicit pharmacies, paying exclusively in cash. Charged with drug-distribution conspiracies and with possessing with intent to distribute controlled substances,[4] defendants invoked § 841(a) of the Controlled Substances Act, which exempts doctors and pharmacists from criminal

---

[1] A "pill mill" is a colloquial term for a medical clinic in which practitioners distribute controlled substances without "medical necessity or therapeutic benefit." *See United States v. Lee*, 966 F.3d 310, 317 (5th Cir. 2020) (describing a "pill mill" as a "a medical practice that serves as a front for dealing prescription drugs").

[2] 21 U.S.C. § 846.

[3] 21 U.S.C. § 841.

[4] 21 U.S.C. § 801 *et seq.*

No. 21-10620

liability for distributing "authorized" controlled substances.[5] By regulation, prescriptions are "authorized" if they are (1) "issued for a legitimate medical purpose" and (2) "by an individual practitioner acting in the usual course of his professional practice."[6] At trial, the Government offered extensive evidence, including text messages, wiretaps, surveillance, cooperator testimony, and records from Defendants' businesses and homes. The jury found Defendants guilty on all counts. The district court sentenced Capistrano and Bubu to 240 months' imprisonment and Thomas to 151 months. Defendants timely appealed.

## II.

We turn first to the standard of our review and then challenges to the sufficiency of the evidence.

## A.

"The standard of review for insufficiency-of-the-evidence claims depends on whether the claims were preserved."[7] As the three defendants preserved their challenges to the sufficiency of the evidence against them by motions filed at trial, our review is *de novo*.[8]

Nonetheless, a "defendant seeking reversal on the basis of insufficient evidence swims upstream."[9] Our review is "highly deferential" to the jury's

---

[5] 21 U.S.C. § 841(a).

[6] 21 C.F.R. § 1306.04(a).

[7] *United States v. Suarez*, 879 F.3d 626, 630 (5th Cir. 2018).

[8] *See United States v. Dailey*, 868 F.3d 322, 327 (5th Cir. 2017) (citation omitted); *United States v. Zamora*, 661 F.3d 200, 209 (5th Cir. 2011).

[9] *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018) (quoting *United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997)).

No. 21-10620

finding of guilt.[10] We will uphold the jury's verdict so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[11] A verdict can be supported by "reasonable inferences from the evidence,"[12] but "may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."[13] "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof."[14] "[T]he jury is free to choose among reasonable constructions of the evidence."[15]

**1.**

Bubu challenges two counts of possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1),[16] which requires the Government to prove beyond a reasonable doubt that Bubu knowingly possessed a controlled substance—here, Hydrocodone and Carisoprodol—

---

[10] *United States v. Zamora-Salazar*, 860 F.3d 826, 831 (5th Cir. 2017) (citation omitted).

[11] *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc) (citation omitted). A "reasonable doubt" is "one 'based on reason which arises from the evidence or lack of evidence.'" *Jackson v. Virginia*, 443 U.S. 307, 317 n.9 (1979) (quoting *Johnson v. Louisiana*, 406 U.S. 356, 360 (1972)).

[12] *United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011) (quoting *United States v. Percel*, 553 F.3d 903, 910 (5th Cir. 2008)).

[13] *Id.* (quoting *United States v. Rojas Alvarez*, 451 F.3d 320, 333 (5th Cir. 2006)).

[14] *United States v. Rodriguez–Mireles*, 896 F.2d 890, 892 (5th Cir. 1990) (quoting *The Reindeer*, 69 U.S. 383, 401 (1864)) (alteration removed); *see also Vargas-Ocampo*, 747 F.3d at 303.

[15] *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994) (citations omitted).

[16] One is for possessing with intent to distribute Hydrocodone to Cynthia Cooks, and the other is for possessing with intent to distribute Carisoprodol to Johnnie Parks. The challenges relate to Count 7 and Count 22 of the indictment, respectively.

No. 21-10620

which she intended to distribute.[17] Bubu's "[p]ossession may be actual or constructive, may be joint among several defendants, and may be proved by direct or circumstantial evidence."[18] "Constructive possession is 'the knowing exercise of, or the knowing power or right to exercise, dominion and control over the proscribed substance.'"[19]

Bubu argues that there was "no evidence that [she] knew of the particular medical conditions of Ms. Cooks and Mr. Parks." The Government counters that there was abundant evidence of Bubu's involvement with recruiters—including her instructing recruiters to "remove [her] logo from vials" and leaving their recruits in the car, as having so many people in the area was a bad look—as well as other "numerous red flags" about Bubu's pharmacy operations, including only accepting cash and charging unusually high prices for controlled substances, priced per pill rather than by a typical prescription quantity.

While § 841 does not require that Bubu *knew* the patients' medical conditions, there must be sufficient evidence that Bubu knew the prescriptions she filled for Cooks and Parks were unauthorized.[20] Bubu concedes that she "knew *some* of the prescriptions emanating from Dr. Capistrano's clinic were invalid." Cooks was one of Capistrano's recruiters who filled her and her recruits' prescriptions at Bubu's pharmacy.[21] Bubu filled Cooks's Hydrocodone prescription from Capistrano for the highest

---

[17] *United States v. Delgado*, 256 F.3d 264, 274 (5th Cir. 2001).

[18] *United States v. Valdiosera–Godinez*, 932 F.2d 1093, 1095 (5th Cir. 1991) (quoting *United States v. Gardea Carrasco*, 830 F.2d 41, 45 (5th Cir. 1987)).

[19] *Id.* at 1096 (quoting *Gardea Carrasco*, 830 F.2d at 45).

[20] *See United States v. Ferris*, 52 F.4th 235, 242–43 (5th Cir. 2022).

[21] Cooks pleaded guilty to drug conspiracy in this case.

possible prescription strength. Cooks testified that she directly interacted with Bubu, including phone calls. Parks was one of Cooks's recruits, and Cooks filled his prescriptions at Bubu's pharmacy. Bubu's dispense log, signed by Bubu, shows that Bubu filled Parks's and another one of Cooks's recruit's prescriptions from Capistrano for controlled substances.

In sum, given the evidence of Bubu's knowledge of Capistrano's clinic's practices and her involvement with recruiters, "a rational trier of fact could have found the elements of the crime beyond a reasonable doubt."[22]

**2.**

Thomas argues that the evidence cannot show he knew any prescriptions were "invalid," and both Thomas and the Government point to "red flags."[23] We turn to the evidence, asking whether a rational jury could find beyond a reasonable doubt that Thomas *knew* the prescriptions were unauthorized.[24]

The testimony of recruiter Wayne Kincade, and his text messages with Thomas, played a prominent role in the Government's case. Kincade started using Thomas's pharmacy to fill his recruits' prescriptions after another recruiter recommended the pharmacy. Kincade told Thomas he was picking up other people's prescriptions because they did not want to drive to the pharmacy. Kincade regularly texted and called Thomas about prescriptions and sent pictures of recruit's IDs if needed. Kincade testified that Thomas operated "by the book," but also that Thomas "fronted"

---

[22] *Dailey*, 868 F.3d at 327 (citation omitted).

[23] Yet to overcome the medical defense, the appropriate inquiry is not about red flags, but about knowledge.

[24] *See Vargas-Ocampo*, 747 F.3d at 303; *Ferris*, 52 F.4th at 242–43.

No. 21-10620

Kincade prescriptions—once more than $1,000 worth—because Thomas trusted that he would pay for the drugs later.

Kincade paid for the prescriptions in cash—three or four at a time for $265 each—sometimes outside of business hours. When Kincade tried to fill more prescriptions each time, Thomas told him it was best to space them out so he would fill some now and the rest the next day. Thomas warned Kincade to "be careful cashing those Capistrano prescriptions because he [is] in the black book." Thomas's pharmacy stopped accepting Capistrano's prescriptions but still filled prescriptions from Dr. Noel, another defendant who pleaded guilty. Kincade never told Thomas he sold drugs or suggested that he was breaking the law, but Kincade affirmed that, like everyone else involved in the conspiracy, Thomas "knew what [he] was doing."

Thomas argues that Kincade's statement that Thomas "wasn't like some of the other pharmacists" and was "by the book" means "it was clear to Mr. Kincade that Mr. Thomas was not a party to a pill mill case." But this view is not the only one fairly drawn from Kincade's testimony that Thomas "knew what [he] was doing." While Thomas imposed some requirements on filling other people's prescriptions, a reasonable jury could infer that Thomas was trying to cover himself, as the Government argued. We may not reweigh the evidence, or second-guess "[c]redibility choices that support the jury's verdict."[25] Juries are "entitled to weigh . . . circumstantial evidence, drawing inferences for or against [a defendant's] knowing and voluntary participation in a conspiracy with others."[26] Where, as here, there are multiple reasonable constructions of the evidence, "the jury is free to choose among [them]."[27]

---

[25] *Zamora-Salazar*, 860 F.3d at 832 (citation omitted).

[26] *Vargas-Ocampo*, 747 F.3d at 303.

[27] *Pennington*, 20 F.3d at 597 (citations omitted). Thomas argues that a reasonable jury cannot find a defendant guilty beyond a reasonable doubt if the "evidence gives equal

No. 21-10620

"[T]he 'relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[28] Considered in the requisite light, the evidence was sufficient for a rational juror to find the requisite *mens rea* here.

**3.**

To sustain a conviction for conspiracy under 21 U.S.C. § 846, the Government must prove beyond a reasonable doubt "(1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy."[29]

Capistrano argues he cannot be convicted of conspiracy because there was no record that he "had any contact, of any type whatsoever," with the pharmacists. Capistrano also argues that there was "no testimony whatsoever that [he] said []or did anything." The Government counters that there was abundant evidence of a conspiracy, and Capistrano's involvement with it as well—including Capistrano instructing individuals to issue prescriptions when he was not there, and prescribing significant quantities of Alprazolam, Carisoprodol, and Hydrocodone, which accounted for 99.7% of his prescriptions—as well as other actions with respect to Capistrano's operations. We have long held that "all members of a conspiracy are not

_____

or nearly equal circumstantial support to a theory of guilt, as well as a theory of innocence." *Moreland*, 665 F.3d at 149. But this Court "abandon[ed] any reliance on the 'equipoise rule'" in *Vargas-Ocampo*. 747 F.3d at 302.

[28] *United States v. Xu*, 599 F.3d 452, 453 (5th Cir. 2010) (quoting *United States v. Valle*, 538 F.3d 341, 344 (5th Cir. 2008)).

[29] *Zamora*, 661 F.3d at 209 (quoting *United States v. Booker*, 334 F.3d 406, 409 (5th Cir. 2003)).

required to know every other member for a conspiracy to exist."[30] Given the attendant record, Capistrano's claim falls short.

## B.

In sum, our highly deferential review compels us to conclude that "'the totality of the evidence permits a conclusion of guilt beyond a reasonable doubt'" for all Appellants on all challenged claims.[31]

## III.

Bubu and Capistrano challenge the jury instructions given at trial. The challenges fail.

## A.

Generally, "this court reviews jury instructions for abuse of discretion and harmless error."[32] "However, when a defendant fails to object to jury instructions, we review for plain error."[33] Since neither Bubu nor Capistrano objected to the jury instructions, we review for plain error.[34]

To establish plain error, one must show that: "(1) the district court erred, (2) the error was clear or obvious, (3) the error affected his substantial rights, and (4) this court should exercise its discretion to correct the error because the error seriously affects the fairness, integrity, or public reputation

---

[30] *Gonzalez*, 907 F.3d at 874 (citing *United States v. Bolts*, 558 F.2d 316, 325 (5th Cir. 1977)).

[31] *United States v. Nieto*, 721 F.3d 357, 365 (5th Cir. 2013) (quoting *United States v. Hicks*, 389 F.3d 514, 533 (5th Cir. 2004)).

[32] *United States v. Vasquez*, 677 F.3d 685, 692 (5th Cir. 2012) (per curiam) (citing *United States v. Betancourt*, 586 F.3d 303, 305 (5th Cir. 2009)).

[33] *Id.*

[34] *See United States v. Nagin*, 810 F.3d 348, 350 (5th Cir. 2016).

No. 21-10620

of judicial proceedings."[35] By the metric of plain error review of jury instructions, a district court does not err when "the instruction, taken as a whole, is a correct statement of the law."[36] "[W]hen a jury instruction omits . . . an essential element of an offense, the error may be severe enough to meet the plain-error standard."[37] When reviewing a jury instruction, we must "consider the jury charge as a whole" and reverse only if the entire charge leaves us "with the substantial and ineradicable doubt whether the jury has been properly guided in its deliberations."[38] In other words, to amount to plain error, the instruction "must 'have meant the difference between acquittal and conviction.'"[39]

After Appellants filed their initial briefs, the Supreme Court issued *Ruan v. United States*.[40] *Ruan* addresses the state of mind requirement to convict doctors under the Controlled Substances Act.[41] In *Ruan*, the Supreme Court overturned the convictions of two doctors for violating 21

---

[35] *In re Deepwater Horizon*, 824 F.3d 571, 583 (5th Cir. 2016) (citation omitted).

[36] *Nagin*, 810 F.3d at 350 (quoting *United States v. Ebron*, 683 F.3d 105, 151–52 (5th Cir. 2012)).

[37] *United States v. Vasquez*, 899 F.3d 363, 378 (5th Cir. 2018) (first alteration in original), *as revised* (Aug. 24, 2018) (quoting *United States v. Fairley*, 880 F.3d 198, 208 (5th Cir. 2018)).

[38] *Septimus v. Univ. of Hous.*, 399 F.3d 601, 607 (5th Cir. 2005) (internal quotations omitted).

[39] *Vasquez*, 899 F.3d at 378 (quoting *Fairley*, 880 F.3d at 208). This is because the party must show that their substantial rights were affected, and to establish that one's substantial rights were affected, defendants bear the burden of showing a reasonable probability that absent the error, they would have been acquitted. *See United States v. Oti*, 872 F.3d 678, 693 (5th Cir. 2017).

[40] 142 S. Ct. 2370 (2022). The Government's brief and Bubu and Capistrano's reply briefs address *Ruan*. Thomas does not address *Ruan*.

[41] *Id.* at 2375.

No. 21-10620

U.S.C. § 841(a)(1), which makes it a federal crime, "[e]xcept as authorized . . . for any person *knowingly or intentionally* . . . to manufacture, distribute, or dispense . . . a controlled substance."[42] Although the defendants could prescribe such substances to their patients, prescriptions are authorized only when a doctor issued it "for a legitimate medical purpose . . . acting in the usual course of his professional practice."[43] The specific question at issue was whether it was "sufficient for the Government to prove that a prescription was *in fact* not authorized," or whether the Government must also "prove that the doctor *knew* or *intended* that the prescription was unauthorized."[44] The Court held that "the statute's 'knowingly or intentionally' *mens rea* applies to authorization."[45] So, "[a]fter a defendant produces evidence that he or she was authorized to dispense controlled substances, the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so."[46]

This Court then decided *United States v. Ferris*, which applied *Ruan* to pharmacist violations of § 841.[47] Emphasizing that it is the *unauthorized* nature of prescriptions that renders conduct wrongful, not the dispensation itself, this Court held that the Government must prove that a pharmacist

_____

[42] 21 U.S.C. § 841(a)(1) (emphasis added).

[43] 21 C.F.R. § 1306.04(a).

[44] *Ruan*, 142 S. Ct. at 2375.

[45] *Id.*

[46] *Id.*

[47] 52 F.4th at 242–43. *Ferris* was decided two days after Bubu submitted her Reply Brief. This Court allowed Bubu, Capistrano, and the Government to file supplemental briefs addressing *Ferris*'s impact on this case.

11

No. 21-10620

"knowingly or intentionally filled unauthorized prescriptions for a patient."[48]

**1.**

Bubu raises two challenges regarding the jury instruction. We address each in turn.

First, Bubu challenges the district court's use of "or" rather than "and" in instructing the jury when a prescription is unauthorized. Section 841 makes it unlawful, "[e]xcept as authorized[,] . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance."[49] A two-pronged definition provides that prescriptions for controlled substances are authorized if they are (1) "issued for a legitimate medical purpose" and (2) "by an individual practitioner acting in the usual course of his professional practice."[50] Bubu argues that the district court erred in instructing the jury that "it could convict upon a finding that she acted *either* without legitimate medical purpose *or* outside the usual practice of medicine, measured objectively."[51]

_____

[48] *Id.* at 243.

[49] 21 U.S.C. § 841(a)(1).

[50] 21 C.F.R. § 1306.04. In *United States v. Armstrong*, we held that because "[b]oth prongs are necessary for a prescription to be legitimate[,] . . . a practitioner is unauthorized to dispense a controlled substance if the prescription *either* lacks a legitimate medical purpose *or* is outside the usual course of professional practice." 550 F.3d 382, 397 (5th Cir. 2008).

[51] Bubu's opening brief argues that the "'knowing and intentional' language of § 841 applies" to both prongs, and that convictions require both prongs. However, Bubu conceded this argument was foreclosed by *Armstrong*. *See Armstrong*, 550 F.3d at 397 ("[A] practitioner is unauthorized to dispense a controlled substance if the prescription either lacks a legitimate medical purpose *or* is outside the usual course of professional practice." (emphasis removed)). In the interim, the Supreme Court decided *Ruan*, and Bubu's reply brief urges that intervening decision "fully vindicates" her argument. We do not see it that

The district court's jury instructions incorrectly stated the law by omitting the *mens rea* element.[52] This satisfies the first two prongs of the plain error test.[53] That said, we find that this error does not warrant a plain error reversal. While it is true the district court erred, and that error was clear, "an instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."[54] To justify reversal on plain error review, Bubu must show that the error affected her substantial rights.[55] "'As a general rule, an error affects a defendant's substantial rights only if the error was prejudicial.'"[56] "'Error is prejudicial if there is a reasonable probability that the result of the proceedings would have been different but for the error.'"[57]

---

way. *Ruan* held that "§ 841's 'knowingly or intentionally' *mens rea* applies to the 'except as authorized' clause." 142 S. Ct. at 2376. The decision does not require that both prongs of authorization be lacking, which Bubu appears to recognize in her reply. Accordingly, a defendant can be convicted *either* for knowing prescriptions were issued for an illegitimate purpose *or* knowing they were dispensed outside the usual course of professional practice. We view *Ruan* as ridding the Government of the option—previously accepted under *Armstrong*—that a defendant can be convicted without knowledge for distributing prescriptions outside the objectively usual course of professional practice. 550 F.3d at 397.

[52] *See Neder v. United States*, 527 U.S. 1, 12 (1999); *Nagin*, 810 F.3d at 350–51; *see also Henderson v. United States*, 568 U.S. 266, 279 (2013) (holding second prong of plain error review considers the law as clarified during time of appeal); *United States v. Kahn*, 58 F.4th 1308, 1316 (10th Cir. 2023) ("*Ruan* expressly disallows conviction under § 841(a)(1) for behavior that is only objectively unauthorized. The [G]overnment must prove that a defendant 'knowingly or intentionally acted in an unauthorized manner.'" (quoting *Ruan*, 142 S. Ct. at 2376)).

[53] *See In re Deepwater Horizon*, 824 F.3d at 583 ("[T]he district court erred [and] the error was clear or obvious.").

[54] *Neder*, 527 U.S. at 9.

[55] *Vasquez*, 677 F.3d at 693.

[56] *United States v. Johnson*, 943 F.3d 214, 223 (5th Cir. 2019) (cleaned up) (quoting *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 363 (5th Cir. 2010)).

[57] *Id.* (quoting *Gonzalez-Rodriguez*, 621 F.3d at 363).

No. 21-10620

In other words, the likelihood of a different result must be enough to undermine confidence in the outcome of the proceedings.[58] Bubu fails to make this showing.

Bubu's failure to meaningfully address the third and fourth prongs of the plain error test either in her opening brief or in reply undermines her challenge.[59] Bubu's initial brief does not argue that but for the error, there would be a reasonable probability she would be acquitted. Bubu even "assume[s] for the purpose of [substantial rights] that the [G]overnment presented sufficient evidence for a jury to find the defendant's guilty knowledge under the correct standard," but that because of the error, Bubu did not have a chance to defend herself.[60]

Bubu's concession shows that she *did* have the "chance to defend herself"—the opportunity to present evidence that could have raised doubts about her knowledge.[61] Additionally, the record shows that Bubu's counsel spent substantial time arguing that Bubu did not knowingly commit a crime. Because Bubu failed to argue that but for the incorrect jury instruction there was a reasonable probability that she would have been acquitted, she does not satisfy the plain error test. Accordingly, although the district court erred—based on an intervening Supreme Court case it could not know about at the time—in instructing the jury, such error does warrant reversal.

_____

[58] *United States v. Holmes*, 406 F.3d 337, 365 (5th Cir. 2005) (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004)).

[59] Bubu addresses the third and fourth prongs in only six sentences.

[60] In support, Bubu cites her procedural history section, which includes a four-page discussion of the evidence the Government introduced to establish knowledge and a single paragraph noting that "some evidence tended to raise doubts about [Bubu's] knowledge."

[61] We note that the two pieces of evidence Bubu points to "to raise doubts" are (1) a codefendant's witness's testimony and (2) testimony from a Government's witnesses.

No. 21-10620

Bubu's second challenge argues the district court erred by "tethering the pharmacist's criminal liability to a doctor's misconduct." She argues that the instructions exclusively address doctors' practices and not pharmacists' practices and that any doctor's unauthorized act—whether known or unknown by the doctor or pharmacist—could be imputed to a pharmacist. We conclude that reasonable minds can differ as to whether the instructions impute doctors' misconduct to pharmacists, as the instructions simply ask the jury to consider each defendant's "usual course of professional practice." "[L]egal error must be clear or obvious, rather than subject to reasonable dispute."[62] This was not.

**2.**

Capistrano raises three jury-instruction challenges. First, Capistrano challenges the instruction given by the district court. The written jury charge correctly instructed the jury to determine whether the controlled substances were "(1) prescribed for what the defendant *subjectively* considered to be a legitimate medical purpose." However, at trial, the district court misread the charge, telling the jurors to consider *objectively* legitimate medical purposes. Capistrano contends this warrants reversal.

To be sure, we have recognized the problematic nature of inconsistent jury instructions.[63] And we have found reversible error when *written* instructions were contradictory on an issue that neither party addressed during closing argument.[64] But when reviewing jury instructions, we "rarely

---

[62] *See Puckett v. United States*, 556 U.S. 129, 135 (2009).

[63] *Aero Int'l, Inc. v. U.S. Fire Ins. Co.*, 713 F.2d 1106, 1113 (5th Cir. 1983) (noting that "it is impossible after verdict to ascertain which instruction the jury followed" (internal quotation omitted)).

[64] *Nowell ex rel. Nowell v. Universal Elec. Co.*, 792 F.2d 1310, 1316–17 (5th Cir. 1986).

15

No. 21-10620

will reverse a conviction based on a district court's insignificant slip of the tongue."[65] A "district court's apparent mistake [is] sufficiently remedied to render any resulting error harmless" when the jury is given a copy of the instruction, in which "[t]he contradictory, erroneous statement is nowhere to be found."[66] "[T]he proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it."[67]

Here, not only was there no error in the written instructions, the parties also spent *extensive* time discussing the subjective knowledge requirement during closing arguments.[68] Even though the district court misspoke, when "consider[ing] the instructions as a whole, the evidence presented, and the arguments of counsel[,]" we do not believe this error is "so fundamental as to result in a miscarriage of justice."[69] Accordingly, we find there was no reversible error.[70]

_____

[65] *United States v. Phipps*, 319 F.3d 177, 190 (5th Cir. 2003) (finding no reversible plain error where one reference was made to proof by a preponderance of the evidence).

[66] *United States v. Sanders*, 70 F.3d 1268 (5th Cir. 1995) (unpublished) (per curiam). In that event, "the district court's 'slip of the tongue,' [is] cured by the straightforward and accurate statement of the applicable law subsequently furnished in writing to the jurors" and "d[oes] not constitute reversible error." *Id.*; *see also Phipps*, 319 F.3d at 190 (holding that a judge's "single slip of the tongue" in mentioning in one count the preponderance-of-the-evidence standard instead of the beyond-a-reasonable-doubt standard in the jury instructions was not plain error).

[67] *Phipps*, 319 F.3d at 190 (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)).

[68] *See United States v. Musgrave*, 483 F.2d 327, 335 (5th Cir. 1973) (affirming a conviction despite a slip of the tongue, because the "[i]solated statements which appear prejudicial when taken out of context [were] innocuous when viewed in the light of the entire trial").

[69] *Nowell*, 792 F.2d at 1316.

[70] *See Vaccaro v. United States*, 461 F.2d 626, 636 (5th Cir. 1972) (noting the "numerous cases in which convictions have been upheld despite erroneous instructions"

Second, like Bubu, Capistrano challenges the district court's use of "or" rather than "and" in instructing the jury when a prescription is unauthorized. Unlike Bubu, however, Capistrano does not argue that the knowledge requirement applies to both authorization prongs. Rather, like Bubu, Capistrano argues that both prongs *must* be satisfied. Because the Government need not prove both prongs, Capistrano fails to establish plain error.

Lastly, Capistrano argues that "the trial court did not clearly explain nor adequately define to the jury what good faith means." The district court's jury instructions make no mention of good faith. However, good faith is not a required element of the offense.[71] Capistrano fails to show any error, plain or otherwise.[72]

## B.

In sum, neither Bubu nor Capistrano have shown that any errors affected their substantial rights or that we should exercise our discretion to correct any such errors.[73] We reject Bubu and Capistrano's arguments that we must vacate their convictions because of the jury instructions.

---

when it was confidently declared that the instructions "did not contribute to the verdict of guilt").

[71] *Cf. United States v. Rodriguez-Escareno*, 700 F.3d 751, 753 (5th Cir. 2012) ("The first step in plain-error review is to determine whether there was error.").

[72] *See Nagin*, 810 F.3d at 350–51.

[73] *See United States v. Broussard*, 669 F.3d 537, 553 (5th Cir. 2012) ("To affect the defendant's substantial rights, the defendant must demonstrate that the error affected the outcome of the district court proceedings."); *United States v. Escalante-Reyes*, 689 F.3d 415, 425 (5th Cir. 2012) ("Additionally, we do not view the fourth prong as automatic if the other three prongs are met.").

## IV.

We next address Bubu's other claims. Her challenges all fail.

## A.

Bubu contends that the district court deprived her of her constitutional right to counsel at a critical stage of the proceeding—during sentencing—by allowing her to proceed pro se without a clear and unequivocal waiver.[74] "Sixth Amendment challenges to the validity of a waiver of counsel are reviewed *de novo*."[75] To determine whether the district court violated Bubu's right to counsel, we ask whether Bubu properly waived her right to counsel and whether the waiver was knowing and intelligent.[76]

## 1.

A criminal defendant, by virtue of the Sixth Amendment, has the right to counsel at trial.[77] The right extends to the sentencing phase just as forcefully as to the guilt phase.[78] "Where a fundamental constitutional right, such as the right to counsel, is concerned, courts indulge every reasonable presumption against waiver."[79] Without a clear election to forgo counsel, "'a court should not quickly infer that a defendant unskilled in the law has waived

---

[74] The parties do not dispute that sentencing is a critical stage in which defendants are entitled to be represented by counsel. *See United States v. Taylor*, 933 F.2d 307, 312–13 (5th Cir. 1991).

[75] *United States v. Mesquiti*, 854 F.3d 267, 271 (5th Cir. 2017) (citation omitted).

[76] *Id.* at 271–72.

[77] *See Taylor*, 933 F.2d at 312.

[78] *Tucker v. Day*, 969 F.2d 155, 159 (5th Cir. 1992) (citing *Taylor*, 933 F.2d at 312).

[79] *Mesquiti*, 854 F.3d at 272 (quoting *United States v. Cano*, 519 F.3d 512, 517 (5th Cir. 2008)).

counsel and has opted to conduct his own defense.'"[80] Defendants "can waive [their] right to counsel implicitly, by [their] clear conduct, as well as by [their] express statement."[81] Further, defendants' "'refusal without good cause to proceed with able appointed counsel constitutes a voluntary waiver of' the right to counsel."[82] "To constitute waiver, such a refusal must take the form of 'a persistent, unreasonable demand for dismissal of counsel.'"[83]

But the right is not limitless. Applied here, a criminal defendant is not entitled to a *particular* counsel, just a *competent* one.[84] As we have described this right previously, "'[a] defendant is entitled to counsel capable of rendering competent, meaningful assistance. . . . No defendant has a right to more.'"[85]

The issue regarding Bubu's representation was no minor dispute, but instead a continuous and long-running issue. At sentencing, Bubu repeatedly stated she did not want her current attorney, J. Stephen Cooper, to represent her. Bubu did not like the attorney previously appointed to her, so the district court allowed Bubu to hire Cooper, who was Bubu's *fourth* attorney. The district court then instructed Bubu: "he is either going to be your lawyer, or you're going to proceed *pro se*." Cooper explained there was "some conflict"

---

[80] *Burton v. Collins*, 937 F.2d 131, 133 (5th Cir. 1991) (quoting *Brown v. Wainwright*, 665 F.2d 607, 610 (5th Cir. 1982)).

[81] *Mesquiti*, 854 F.3d at 272 (citation omitted).

[82] *Id.* (quoting *United States v. Fields*, 483 F.3d 313, 350 (5th Cir. 2007)).

[83] *Id.* (quoting *United States v. Moore*, 706 F.2d 538, 540 (5th Cir. 1983)).

[84] *Moore*, 706 F.2d at 540; *see also Richardson v. Lucas*, 741 F.2d 753, 756 (5th Cir. 1984) ("Although the sixth amendment's right to counsel in criminal cases is absolute, an accused's right to a particular counsel is not.").

[85] *McQueen v. Blackburn*, 755 F.2d 1174, 1178 (5th Cir. 1985) (quoting *Moore*, 706 F.2d at 540).

between Cooper and Bubu and that Bubu refused to talk to him.[86] The district court instructed Cooper to discuss the PSR and the dangers of self-representation with Bubu. After a 47-minute break, Cooper reported that Bubu refused to look at any documentation with him and when he spoke about the dangers of self-representation, she turned her back to him and said: "I'm representing myself." Bubu told the district court she wanted a different lawyer to represent her. The district court spoke with the attorney Bubu wanted, who said he had not yet been retained to represent Bubu and that it would "not be feasible" to represent her at that time. The Government objected to Bubu bringing on a fifth attorney because "it seem[ed] like . . . a delay tactic" since Bubu had received "competent representation from her first lawyer through her fourth lawyer." The district court agreed and, not wanting to keep delaying sentencing and recognizing Bubu's "pattern" of "refus[ing] to talk to [her] attorneys[,]" denied Bubu's request to fire Cooper and hire new counsel.

When asked if she desired to represent herself, Bubu responded "No" but also insisted that Cooper could not represent her. When told she had to choose between two options: either Cooper representing her or representing herself, Bubu refused to answer the question, reiterating: "I want new counsel." After more back and forth, the district court concluded: "you've made clear that you do not want Mr. Cooper to represent you in this case . . . So that means, ma'am, you are going to represent yourself." The district court proceeded, then Bubu interjected to say: "I cannot represent myself right now, sir." The district court asked Bubu to not interrupt him, and Bubu again said, "I cannot represent myself." The district court asked if she

---

[86] Cooper claims Bubu asked him to withdraw but refused to sign a motion to withdraw. Bubu claims there is "no record" that she spoke to Cooper and asked him to withdraw.

wanted Cooper to come back, which she eventually agreed to. Cooper returned and argued that Bubu "needs some credit for an exemplary life prior to this event," asked for a minimum guidelines sentence, and introduced Bubu's children to speak on her behalf.

Bubu's conduct—which she concedes was "frustrating"—waived counsel. Bubu persistently and unreasonably demanded that her counsel be dismissed. After having already dismissed multiple attorneys and refusing to cooperate and communicate with Cooper—and even turning her back to him—she insisted she would represent herself. Although Bubu never told the court she wished to represent herself, her actions relinquished her right to counsel.[87] Bubu does not argue that she had good cause to not proceed with Cooper.[88] And we have long-held that "[a] defendant's refusal without good cause to proceed with *able appointed counsel* constitutes a voluntary" decision to proceed pro se.[89] We find Bubu's actions as a voluntary waiver of the right to counsel.

## 2.

While Bubu may have voluntarily waived the right to counsel, we must next ask if it was done knowingly and intelligently.[90] Defendants must "be

---

[87] *See Mesquiti*, 854 F.3d at 274 ("Mesquiti stated, 'I don't accept [current counsel] as my lawyer and I don't consent to these proceedings.'").

[88] *See United States v. Simpson*, 645 F.3d 300, 308 (5th Cir. 2011) (holding a defendant does not have "good cause" to appoint substitute counsel where the defendant refused to communicate with his attorney).

[89] *United States v. Romans*, 823 F.3d 299, 313 (5th Cir. 2016) (emphasis added) (quoting *Dunn v. Johnson*, 162 F.3d 302, 307 (5th Cir. 1998)); *see also In re Hipp, Inc.*, 5 F.3d 109, 114–15 (5th Cir. 1993).

[90] To be sure, the waivable right to counsel does not *force* a requirement of counsel on an unwilling criminal defendant. *Faretta v. California*, 422 U.S. 806, 819, 833–35 (1975).

No. 21-10620

made aware of the dangers and disadvantages of self-representation."[91] We require "district courts to exercise discretion in determining the precise nature of the warning provided to a defendant seeking to represent himself, depending on the circumstances of the individual case."[92] "Although . . . the precise nature of appropriate warnings depends on the particularities of the case, we have generally required trial courts to provide warnings of substance, including at least a modicum of specificity."[93]

Bubu argues that even if she waived her right to counsel, it was not a knowingly and intelligent choice because the court did not advise her that repeatedly requesting a new lawyer or asking for a continuance would result in immediate self-representation. The record shows otherwise.

The district court told Bubu, "I am not continuing the case any longer. And so that means today, you can represent yourself . . . or you can be represented by Mr. Cooper." The sentencing transcript reveals the district court repeatedly advised Bubu against self-representation and of the disadvantages of self-representation. For example, the district court cautioned Bubu: "I'm going to advise you that, in my opinion, you will be far better off remaining with your retained attorney, Mr. Cooper. I think it is unwise of you to try to represent yourself." The district court even instructed

_____

A defendant may only relinquish this right, however, if it is *knowingly and intelligently*. *Id.* at 835; *see also Mesquiti*, 854 F.3d at 272 (quoting *Tovar*, 541 U.S. at 81).

[91] *Faretta*, 422 U.S. at 835 (citation omitted).

[92] *Mesquiti*, 854 F.3d at 272–73 (citation omitted). "The trial court must consider various factors, including 'the defendant's age and education and other background, experience, and conduct.'" *Id.* at 273 (quoting *McQueen*, 755 F.2d at 1177).

[93] *Id.* at 273. "The court must ensure that the waiver is not the result of coercion or mistreatment of the defendant and must be satisfied that the accused understands the nature of the charges, the consequences of the proceedings, and the practical meaning of the right [being waived]." *Id.* (quoting *McQueen*, 755 F.2d at 1177).

Cooper to discuss "dangers and disadvantages" of self-representation with Bubu. Bubu argues that the court should have to warn defendants that their conduct could result in self-representation. While sometimes district courts do this,[94] we have never imposed such a requirement[95] and we decline to do so today. Given the district court's multiple warnings and attempts to reason with Bubu, we hold Bubu knowingly and voluntarily waived her right to counsel.

## B.

Bubu challenges the district court's refusal to grant a continuance. "A district court's denial of a continuance is reviewed for abuse of discretion."[96] "Trial judges have 'broad discretion' in ruling on motions for a continuance."[97] "[T]he movant must show that the denial resulted in specific and compelling or serious prejudice."[98] "This is true even where the denial of the continuance will shorten the amount of time available for preparation of the defendant's case."[99] "In review, we evaluate each situation on a case-by-case basis and normally consider only the reasons for continuance presented to the trial judge."[100] To establish that denying a

---

[94] *See Moore*, 706 F.2d at 539 (noting the court warned it was "highly likely" that the defendant's "failure . . . to cooperate with [his attorney] in preparation of his case will be construed . . . as a waiver of his right to counsel").

[95] *See generally, e.g.*, *Mesquiti*, 854 F.3d at 267.

[96] *United States v. Piper*, 912 F.3d 847, 853 (5th Cir. 2019) (per curiam) (citations omitted).

[97] *Mesquiti*, 854 F.3d at 275 (quoting *United States v. Scott*, 48 F.3d 1389, 1393 (5th Cir. 1995)).

[98] *United States v. Barnett*, 197 F.3d 138, 144 (5th Cir. 1999) (internal quotation omitted).

[99] *United States v. Gates*, 557 F.2d 1086, 1088 (5th Cir. 1977) (citation omitted).

[100] *Mesquiti*, 854 F.3d at 275 (quoting *Scott*, 48 F.3d at 1393).

continuance was an abuse of discretion, Bubu "must show that the denial resulted in 'specific and compelling or serious prejudice.'"[101] We will uphold the decision below so long as it was not arbitrary or unreasonable.[102]

Bubu argues the district court abused its discretion in denying her continuance request made at sentencing because she was unprepared to represent herself. While Bubu's briefs identify the correct standard, she fails to address the "specific and compelling or serious prejudice" that resulted from the denial of the continuance. To be sure, Bubu maintains that she needed more time to prepare to discuss her PSR objections. That said, she fails to explain how this discussion would have aided her defense. She therefore cannot establish prejudice.[103]

The record also indicates that prior to Bubu's request, the district court paused proceedings and instructed Bubu and her counsel to review the PSR. She refused to do so. Any resulting prejudice was by her own hand. Bubu's counsel was available and capable of representing her, and she may not indefinitely postpone hearings to seek representation.[104] The district court acted well within its discretion in refusing to grant the requested continuance.

## C.

Bubu argues that the district court erred by adopting the PSR without first hearing objections from her attorney, violating her Rule 32 rights, which

---

[101] *Id.* (quoting *Barnett*, 197 F.3d at 144).

[102] *United States v. Stalnaker*, 571 F.3d 428, 439 (5th Cir. 2009) (citation omitted).

[103] *See Mesquiti*, 854 F.3d at 276.

[104] *See Gates*, 557 F.2d at 1088 ("[A] defendant 'may not indefinitely postpone trial by continued applications for more time to seek representation.'" (quoting *United States v. Arlen*, 252 F.2d 491, 494 (2d Cir. 1958))).

require sentencing courts to "allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence."[105] Because Bubu did not object to the PSR below, plain error review applies.[106]

Bubu argues neither she nor her attorney had a chance to object. Nowhere does the Rule require courts to hear comments *before* ruling on PSR objections. The Rule governing parties' opportunities to speak, Rule 32(i)(4)(A), provides that defendants and their attorneys must have an opportunity to speak "[b]efore imposing sentence," not before adopting the PSR.[107] Bubu argues but cites no support for the assertion that "[a]t least where the defendant proceeds *pro se*, the same reasoning suggests that the court errs when ruling on PSR objections without soliciting argument from the defendant." We have noted that "'[t]he touchstone of [R]ule 32 is reasonable notice' to allow counsel adequately to prepare a meaningful

---

[105] FED. R. CRIM. P. 32(i)(1)(C). Bubu's initial brief quotes the correct subsection—Rule 32(i)(1)(C)—but incorrectly cites to 32(i)(4)(C), which is not relevant to Bubu's appeal. Bubu's Reply Brief cites the correct provision in some places and the incorrect in others.

[106] *See United States v. Reyna*, 358 F.3d 344, 350 (5th Cir. 2004) (en banc). While Bubu did not object to this below, she argues that we should review for harmless error because she was not given an opportunity to object. *See* FED. R. CRIM. P. 51(b) ("If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party."). However, the sentencing transcript reveals that Bubu did not attempt to object to the PSR. Bubu points to the judge telling her: "Please don't interrupt me." But not only was Bubu interrupting to object to her self-representation, this occurred *after* the court acknowledged and ruled on the PSR objections. We have long held that "[a] party must raise a claim of error with the district court in such a manner so that the district court may correct itself." *United States v. Krout*, 66 F.3d 1420, 1434 (5th Cir. 1995) (quoting *United States v. Bullard*, 13 F.3d 154, 156 (5th Cir. 1994)). Bubu did not do so here.

[107] FED. R. CRIM. P. 32(i)(4)(A).

response and engage in adversary testing at sentencing."[108] Here, both Bubu and her attorney were given opportunities to speak at sentencing. While the Federal Sentencing Guidelines say that "[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor[,]" it notes that counsel's "[w]ritten statements" may suffice.[109] That is what happened here. Bubu's attorney filed written objections. Additionally, unlike Rule 32(i)(1)(B) and Rule 32(i)(4)(A), Rule 32(i)(1)(C) does not require courts to "give [defendants] a reasonable opportunity to comment,"[110] "address the defendant personally,"[111] or "provide the defendant's attorney an opportunity to speak."[112] Rule 32(i)(1)(C) instead requires that parties' attorneys be allowed to comment.[113] At no point did the district court prohibit Bubu's attorney from commenting. Bubu has not established that the district court committed a clear or obvious violation of Rule 32(i)(1)(C).

---

[108] *United States v. Angeles–Mendoza*, 407 F.3d 742, 749 n.12 (5th Cir. 2005) (emphasis omitted) (quoting *United States v. Andrews*, 390 F.3d 840, 845 (5th Cir. 2004)); *see also Irizarry v. United States*, 553 U.S. 708, 715 (2008) ("Sound practice dictates that judges in all cases should make sure that the information provided to the parties in advance of the hearing, and in the hearing itself, has given them an adequate opportunity to confront and debate the relevant issues.").

[109] U.S. SENT'G GUIDELINES MANUAL § 6A1.3 & cmt (U.S. Sent'g Comm'n 2016).

[110] Rule 32(i)(1)(B).

[111] Rule 32(i)(4)(A)(ii).

[112] Rule 32(i)(4)(A)(i).

[113] Rule 32(i)(1)(C).

**D.**

Bubu challenges as improper hearsay the admission of an investigator's testimony about an intercepted conversation between LaTonya Tucker, a receptionist for Capistrano who secured money from patients, and Ritchie Milligan, a recruiter, in which the two discuss "Little Barry Hill."[114] Although evidentiary rulings are usually reviewed for abuse of discretion, a defendant must preserve the challenge through an objection.[115] We review unpreserved challenges for plain error.[116]

Bubu argues she preserved the challenge by objecting to and referencing the presence of double hearsay in the challenged testimony at trial. But at trial, Bubu objected to a wiretapped conversation between Tucker and Milligan as double hearsay because it included "two different people talking." The testimony about Jonathan McGillivray that Bubu challenges on appeal occurred *after* the district court overruled Bubu's double hearsay objection. That objection did not preserve the error Bubu now urges because it was not "sufficiently specific to alert the district court to the nature of the alleged error and to provide an opportunity for correction."[117] We therefore review for plain error.[118]

---

[114] *See* FED. R. EVID. 801(d)(2)(E); *see also, e.g.*, *United States v. El-Mezain*, 664 F.3d 467, 501–03 (5th Cir. 2011), *as revised* (Dec. 27, 2011) (discussing Rule 801(d)(2)(E)). The conversation revealed (1) that Bubu allowed Little Barry Hill to fill fraudulent prescriptions, and (2) that Little Barry Hill is a street name for Jonathan McGillivray.

[115] *United States v. Morin*, 627 F.3d 985, 994 (5th Cir. 2010) (citing *United States v. Sanchez-Hernandez*, 507 F.3d 826, 831 (5th Cir. 2007)).

[116] *United States v. Akins*, 746 F.3d 590, 597 (5th Cir. 2014).

[117] *United States v. Neal*, 578 F.3d 270, 272 (5th Cir. 2009) (citing *United States v. Ocana*, 204 F.3d 585, 589 (5th Cir. 2000)).

[118] *Akins*, 746 F.3d at 597.

Bubu contends this testimony is double hearsay because "[i]t reflected both the conversation between Ms. Tucker and Mr. Milligan *and* some prior conversation relating these facts about Mr. McGillivray to either Ms. Tucker or Mr. Milligan." Bubu does not contest that the conversation between Tucker and Milligan is admissible under the conspiracy hearsay exclusion. She rather argues that Turner and Miller do not have personal knowledge of the information about McGillivray. But this contention brings no comfort. The record is insufficient to determine whether Turner or Miller obtained the information about McGillivray first-hand or in the furtherance of a conspiracy.[119] Any error was neither plain nor obvious. And there was substantial evidence about McGillivray and Bubu's fraudulent transactions,[120] so even if we did find errors, they did not affect Bubu's substantial rights or seriously affect her trial's fairness. We find no reversible error.

## E.

Bubu challenges the district court's allowing a DEA agent to authenticate her signature as a lay witness. Since Bubu objected at trial, the district court's ruling on the admissibility of evidence is reviewed for abuse

---

[119] The parties argue about this possibility in their briefs. A statement is "not hearsay" if "[t]he statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E).

[120] Evidence at trial included text messages between McGillivray and Bubu disputing cash payments. McGillivray sent Bubu text messages saying things like "I will draw [sic] off the patients I owe you tomorrow" and "I have all the patients and all my money." Bubu told McGillivray to "Please remove [her pharmacy's] logo from vials." And on the day the Texas State Board of Pharmacy went to Bubu's pharmacy, Bubu sent McGillivray a series of frantic texts, including: "Emergency" and "They say all X are fake. Call me."

of discretion subject to harmless error.[121] The metric is "unless manifestly erroneous," we will not reverse.[122]

At trial, the district court overruled Bubu's objection to a DEA agent's lay testimony identifying two of her signatures.[123] The agent gained familiarity with Bubu's handwriting during the course of the investigation. Bubu argues that familiarity developed during a criminal investigation is "acquired for purposes of the litigation" and not admissible as lay witness testimony. While we have not addressed whether an investigator who develops familiarity about handwriting during an investigation may authenticate the handwriting as a lay witness, our sister circuits have. We are persuaded by their reasoning.

Under Rule 901 of the Federal Rules of Evidence, a signature can be authenticated by "[a] nonexpert's opinion that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation."[124] "Testimony based upon familiarity acquired for purposes of the litigation," on the other hand, must be provided as expert testimony.[125] The First, Second, Sixth, Eighth, and Eleventh Circuits all allow investigators who become familiar with handwriting in the process of solving a crime to testify at trial as lay witnesses.[126] "Each of those circuits has drawn a distinction,

---

[121] *United States v. Moparty*, 11 F.4th 280, 295 (5th Cir. 2021) (citations omitted).

[122] *Brumfield v. Hollins*, 551 F.3d 322, 330 (5th Cir. 2008) (citing *United States v. Tucker*, 345 F.3d 320, 326 (5th Cir. 2003)).

[123] Bubu concedes in her reply that the third signature she objected to, Tomlinson's signature on a patient consultation log, has no bearing on her case.

[124] FED. R. EVID. 901(b)(2).

[125] FED. R. EVID. 901(b) advisory committee's note.

[126] *See United States v. Iriele*, 977 F.3d 1155, 1167 (11th Cir. 2020); *United States v. Harris*, 786 F.3d 443, 447–48 (6th Cir. 2015); *United States v. Ali*, 616 F.3d 745, 753–54 (8th

No. 21-10620

either explicitly or implicitly, between becoming familiar with someone's handwriting 'for the current litigation' and doing so for the purpose of determining if the defendant has committed a crime."[127] We found no sister circuit holding differently, nor did Bubu identify one.

Here, the agent's testimony was not merely a "one-shot comparison" where a witness identifies handwriting for the first time in the courtroom during trial.[128] Rather, over the course of the investigation, the agent reviewed 20,000 pages of prescriptions with witness signatures. Given that an "investigator is in the same position as any other lay witness who, as part of his job or in his day-to-day affairs, has seen examples of the defendant's handwriting, such as the defendant's 'accountant, employee[,] or family member[,]'"[129] we join our four sister circuits in holding that the district court did not err in admitting the agent's testimony.

## V.

Finally, we address Capistrano's other claims. None is meritorious.

_____

Cir. 2010); *United States v. Samet*, 466 F.3d 251, 256 (2d Cir. 2006); *United States v. Scott*, 270 F.3d 30, 48–50 (1st Cir. 2001).

[127] *Iriele*, 977 F.3d at 1166.

[128] *Cf. United States v. Pitts*, 569 F.2d 343, 348 (5th Cir. 1978) (holding lay testimony was properly excluded when the "familiarity" was gained "solely by comparing the signature" to the witness's signature on day of trial).

[129] *Iriele*, 977 F.3d at 1167 (first alteration in original) (quoting *Samet*, 466 F.3d at 256); *see also United States v. Kilgore*, 518 F.2d 496, 498 (5th Cir. 1975) (holding witnesses with experience viewing a defendant's initials and the types of documents they would sign could prove that by affidavit).

## A.

Capistrano objects to statements made during the Government's closing argument as mischaracterizing the facts. The statements were objected to at trial. We review for abuse of discretion.[130]

"A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone," and "[t]he determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict."[131] To determine whether there was prosecutorial misconduct, we ask whether "the prosecutor made an improper remark" and whether "the defendant was prejudiced."[132] Prejudice is a "high bar."[133]

Capistrano objected to the Government's assertion that he had "zero cancer patients." The district court overruled the objection and instructed the jury: "you will remember what the evidence shows." "The closing argument must be analyzed in the context of the entire case to determine whether it affected substantial rights of the accused. In making this determination, [we] should consider the strength of the [G]overnment's case and the trial court's instructions to the jury."[134] The evidence shows that a "few" of Capistrano's patients were diagnosed with cancer. But Capistrano did not treat patients for cancer, he treated them for "pain." So when one of Capistrano's employees was asked if they saw "any cancer patients at all[,]"

---

[130] *See United States v. Griffin*, 324 F.3d 330, 361 (5th Cir. 2003) (citation omitted).

[131] *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989) (per curiam) (citations omitted).

[132] *Fields*, 483 F.3d at 358 (quotation marks and citation omitted).

[133] *United States v. Reagan*, 725 F.3d 471, 492 (5th Cir. 2013) (internal quotation and citation omitted).

[134] *United States v. Chase*, 838 F.2d 743, 749 (5th Cir. 1988) (citation omitted).

she responded "No." Given the substantial evidence against Capistrano and the district court's instructions to "remember what the evidence shows," we find no reversable error. Indeed, the Government's argument is consistent with the evidence. Moreover, if the evidence in the case to support a conviction is strong, it is unlikely that the defendant was prejudiced by any improper arguments made by the prosecutor in closing arguments.[135]

## B.

Capistrano argues his counsel was ineffective because he did not request home detention, failed to make various objections, failed to investigate claims, failed to object to jury instructions, and failed to request a *Franks* hearing.[136] Yet we review a claim for ineffective assistance of counsel ("IAC") on direct appeal "[o]nly when the record is sufficiently developed with respect to such a claim."[137] That is, evidence or examples establishing deficient performance or prejudice.[138] We have none here. As the record is not sufficiently developed to evaluate Capistrano's IAC claim, we decline to consider the claims on direct appeal.[139]

---

[135] *See United States v. Diaz-Carreon*, 915 F.2d 951, 956 (5th Cir. 1990). Even if we did credit this claim, after reviewing the record and considering the relevant factors, we cannot conclude that remark undermines the correctness of the verdict.

[136] *See generally Franks v. Delaware*, 438 U.S. 154 (1978).

[137] *United States v. Rosalez-Orozco*, 8 F.3d 198, 199 (5th Cir. 1993) (internal quotation and citation omitted).

[138] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[139] *See United States v. Isgar*, 739 F.3d 829, 841 (5th Cir. 2014); *see also United States v. Gulley*, 526 F.3d 809, 821 (5th Cir. 2008) (per curiam) ("If we cannot fairly evaluate the claim from the record, we must decline to consider the issue without prejudice to a defendant's right to raise it in a subsequent proceeding." (citations omitted)).

No. 21-10620

## C.

Capistrano is proceeding *pro se*, so we must "interpret his brief liberally to afford all reasonable inference which can be drawn from them."[140] By the rules, *pro se* "litigants must still brief the issues and reasonably comply with the standards of Rule 28 in order to preserve them."[141] Failure to comply with this Court's rules results in dismissal.[142] We will not address his remaining arguments as they either are frivolous or inadequately briefed.[143]

## VI.

In sum, we AFFIRM Appellants' convictions and sentences. There is sufficient evidence for a jury to draw reasonable inferences to support Appellants' convictions. Bubu and Capistrano fail to make the showings necessary to warrant plain error reversal. Bubu's refusal to be represented by her retained attorney amounted to a knowing and voluntarily waiver of counsel. Bubu fails to show the necessary prejudice for her challenges to the denial for a continuance, as well as permitting a DEA agent to authenticate her signature as a lay witness. The Government's closing argument was

---

[140] *In re Tex. Pig Stands, Inc.*, 610 F.3d 937, 941 n.4 (5th Cir. 2010) (citation omitted).

[141] *Arredondo v. Univ. of Tex. Med. Branch at Galveston*, 950 F.3d 294, 298 (5th Cir. 2020) (internal quotation and citation omitted).

[142] *Id.* (citation omitted)

[143] These include claims: (1) that the district court lacked subject matter jurisdiction over him because Article III does not mention "district court[s]"; (2) the Government lacked standing because the United States of America cannot be a named party; (3) he cannot be convicted for a Title 21 offense because he did not sign a contract with the United States; (4) he was not allowed to testify before being charged by a grand jury; (5) he was a victim of selective prosecution; (6) he had a right to a hearing of which he was deprived; (7) the district court inappropriately engaged in usurping the power of the State of Texas's medical board; (8) the evidence offered at trial was falsified; and (9) the government failed to turn over his patient files.

No. 21-10620

consistent with the evidence. The record is not sufficiently developed to evaluate Capistrano's IAC claim. And Capistrano's additional claims are either frivolous or insufficiently briefed.

AFFIRMED.

No. 21-10620

Patrick E. Higginbotham, *Circuit Judge*, concurring in part and dissenting in part:

Decades ago, Justice Oliver Wendell Holmes, Jr., and Judge Learned Hand, two of our nation's preeminent legal minds, were having lunch, and after breaking bread, "as Holmes began to drive off in his carriage, Hand, in a sudden onset of enthusiasm, ran after him, crying, 'Do justice, sir, do justice.' Holmes stopped the carriage and reproved Hand: 'That is not my job. It is my job to apply the law.'"[1]

"The exchange between the two judges is part of an age-old struggle to define the relation of law and justice and to determine to which the judge owes loyalty."[2] In Hand's telling of the story, he did so only "to provoke a response" from Holmes, knowing full-well that he agreed with Holmes's view of his juridical responsibility.[3] And, indeed, as students of these two stalwarts and their jurisprudential philosophy know both believed their duty and fidelity was *strictly* to the law rather than to one's individual concept of a just outcome.[4] By contrast, those like Chief Justice Earl Warren or Judge J.

---

[1] Robert H. Bork, The Tempting of America 6 (1990). Over the years, this story has been told with slight variations. *See, e.g.*, Michael Herz, *"Do Justice!": Variations of A Thirce-Told Tale*, 82 Va. L. Rev. 111, 111–12 (1996) (retelling the story as told by Hand himself, Bork, and Prof. Abram Chayes).

[2] Herz *supra* n.1 at 112–13.

[3] *Id.* at 111 (quoting Learned Hand, A Personal Confession, *in* The Spirit of Liberty 302, 306-07 (Irving Dilliard ed., 3d ed. 1960)).

[4] *See id.* at 114–15 & n.11–13; *see also* William J. Brennan, Jr., *In Memoriam: J. Skelly Wright*, 102 Harv. L. Rev. 361 (1988) ("If useful at all, the labels may be more serviceable to distinguish the judge who sees his role as guided by the principle that 'justice or righteousness is the source, the substance and the ultimate end of the law,' from the judge for whom the guiding principle is that 'courts do not sit to administer justice, but to administer the law.' Such legendary names as Justice Holmes and Judge Learned Hand have been associated with the latter view.").

No. 21-10620

Skelly Wright, two luminaries of their day, fall into the latter category.[5] With regard to Bubu's conviction on Count 3, the majority is loyal to neither.

Though I join the remainder of the Court's opinion vis-à-vis Bubu's other convictions as well as those of her co-defendants, as I believe there is a miscarriage of justice afoot, I would not affirm the sentence imposed for her drug trafficking conviction in Count 3.

## I.

One month after oral argument, Bubu's counsel moved to file supplemental briefing raising a new claim: "whether the Court reversibly erred in imposing a sentence of 20 months on Count Three, when 21 U.S.C. §§ 841(b)(1)(E)(3) and 846 set forth a maximum of 12 months."[6] The unopposed motion for leave to file was directed to me as a single judge matter and granted, with a request that the Government respond.[7] It did, "agree[ing] [that] the sentence exceeded the statutory maximum and that the sentence could not be greater than 12 months" and urging that "the Court [] reform the judgment to reduce the sentence" in accordance with the statutory maximum rather than remanding altogether.[8] In other words, the Government conceded plain error urging that the panel correct the error rather than remand for a new sentencing hearing.

––––––––––––––––––––––––––––––

[5] *See* Brennan, *supra* n.4 at 361–62;

[6] Unopposed Motion for Leave to File Supplemental Letter Brief Regarding Statutory Maximum on Count Three at 1, *United States v. Ethel Oyekunle-Bubu*, No. 21-10620 (Dkt. No. 455).

[7] *See generally* Order, *United States v. Ethel Oyekunle-Bubu*, No. 21-10620 (Dkt. No. 459).

[8] Government's Response to Supplemental Letter Brief at 2, *United States v. Ethel Oyekunle-Bubu*, No. 21-10620 (Dkt. No. 455).

No. 21-10620

## II.

When the Government confesses that a person is facing nearly a year in prison for which there is no legal basis—it matters. Nigh a century ago, the Supreme Court made clear that "[i]n exceptional circumstances, *especially in criminal cases*, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings."[9] Twenty-six and a half years later, the High Court reaffirmed that principle.[10] Since that pronouncement, our Court has taken that principle to heart, "recogniz[ing] an exception to" the general waiver rule "whereby we will consider a point of error not raised on appeal when it is necessary 'to prevent a miscarriage of justice.'"[11] The Federal Rules of Criminal Procedure specifically endow us with the authority to reverse a sentence on the basis of plain error, even though the defendant has

---

[9] *United States v. Atkinson*, 297 U.S. 157, 160 (1936) (emphasis added).

[10] *See Silber v. United States*, 370 U.S. 717, 718 (1962) (quoting *Atkinson*, 297 U.S. at 160).

[11] *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009) (quoting *United States v. Montemayor*, 703 F.2d 109, 114 n.7 (5th Cir. 1983)); *see also*, *e.g.*, *United States v. Douglas*, 910 F.3d 804, 806 (5th Cir. 2018), *as revised* (Dec. 19, 2018) ("The threshold question is whether we should address the district court's error at all because Douglas did not object below or raise this issue in his opening brief. We answer in the affirmative."); *United States v. Delgado*, 672 F.3d 320, 329 (5th Cir. 2012) (en banc) ("[I]n very rare instances, we have applied the plain-error standard to errors neither preserved below *nor* argued on appeal."); *United States v. Gonzalez*, 259 F.3d 355, 359 (5th Cir. 2001) ("We may raise an issue sua sponte 'even though it is not assigned or specified' when 'plain error is apparent'" (quoting *United States v. Pineda–Ortuno*, 952 F.2d 98, 105 (5th Cir. 1992))); *United States v. Musquiz*, 445 F.2d 963, 966 (5th Cir. 1971) ("We notice this error on our own motion, as we think we are required to do when the error is so obvious that failure to notice it would 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" (quoting the above passage from *Atkinson* quoted in *Silber*)).

No. 21-10620

not raised the issue on appeal.[12] And of course, this issue was raised on appeal, albeit not in a timely fashion. To these eyes, the error at issue here falls squarely within this exception. This is no minor error, but one the Government *concedes* will subject Bubu to nearly one year of prison beyond her legal sentence.

If the point is to impose discipline upon counsel for their shortcomings, it misses the mark. As Chief Justice Marshall wrote just over two centuries ago, "the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment."[13] Affirming this sentence beyond what Congress permits, as our Court does today, exceeds our power and usurps that of the Congress. Indeed, I can think of no clearer subject of "exceptional circumstances" worthy of action than an unlawful sentence.[14] And in conceding the error, the Government asked this Court to correct the error and otherwise affirm rather than remand for resentencing.[15]

------

[12] *See Whitfield*, 590 F.3d at 346–47 (quoting Fed. R. Crim. P. 52(b): "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention").

[13] *United States v. Wiltberger*, 18 U.S. 76, 95 (1820).

[14] *Accord, e.g.*, *United States v. Graham*, 275 F.3d 490, 522 (6th Cir. 2001) ("Both the Supreme Court and this circuit have found *sua sponte* consideration of plain error to be appropriate to remedy unlawful sentences imposed by the district court."); *cf. Bartone v. United States*, 375 U.S. 52, 53 (1963) (holding that district court's error in increasing sentence by one day in the absence of the defendant "was so plain . . . that it should have been dealt with by the Court of Appeals, even though it had not been alleged as error"). And beyond fairness, "judicial economy [also] dictate[s] that we address now this issue that would doubtless otherwise be raised in a subsequent habeas proceeding." *Pineda-Ortuno*, 952 F.2d at 105.

[15] *See generally* Government's Response to Supplemental Letter Brief, *United States v. Ethel Oyekunle-Bubu*, No. 21-10620 (Dkt. No. 455).

No. 21-10620

Our Court has corrected errors in unlawful sentences without remand for unlawful terms of supervised release[16] or where the modification of the carceral term for one count did not impact the *total* imprisonment.[17] I would remand the case and allow the able district judge to exercise his discretion.

The form of the remedy aside—affirm with a modification or remand—inaction ought not be countenanced, as the Court's opinion demands Ethel Oyekunle-Bubu stay in prison eight months more than Congress deemed permissible.

---

[16] *See United States v. McWaine*, 290 F.3d 269, 277 (5th Cir. 2002) ("Although McWaine does not raise this issue, we have the discretion to sua sponte modify the term. . . . This Court has modified terms of supervised release that exceeded the statutory maximum without remanding for re-sentencing. Accordingly, this Court hereby modifies the district court's sentence of five years' supervised release for Count 1 to three years."); *United States v. Castenada*, No. 00-40929, 2002 WL 334721, at *1 (5th Cir. 2002) (unpublished) (per curiam) ("We find that Castenada's four-year term of supervised release exceeds the statutory maximum of three years. . . . We therefore modify Castenada's supervised release to the statutorily mandated three-year term.").

[17] *See United States v. Sotelo*, 401 F. App'x 967, 969 (5th Cir. 2010) (unpublished) (per curiam) ("Sotelo's 87–month sentence exceeds the statutory maximum of 60 months for the conspiracy offense. Accordingly, we MODIFY Sotelo's sentence for the conspiracy charge to 60 months in prison. . . . The modification does not affect the overall term of imprisonment because Sotelo's concurrent sentence for his exportation charge exceeds the modified sentence. . . . Sotelo's sentences are thus AFFIRMED as modified."); *United States v. Hernandez-Muniz*, 354 F. App'x 133, 134 (5th Cir. 2009) (unpublished) (per curiam) ("The maximum term of imprisonment allowed for a violation of § 1324(a)(1)(A)(ii) and (v)(ii) is five years. . . . As the Government concedes, Hernandez-Muniz's sentence of 65 months of imprisonment for transporting an alien exceeds the 60-month maximum and constitutes plain error that affects his substantial rights and affects the fairness, integrity, and public reputation of the judicial proceedings. . . . Accordingly, we modify the term of imprisonment imposed for Hernandez-Muniz's conviction for violating § 1324(a)(1)(A)(ii) and (v)(ii) to 60 months. . . . The modification does not affect the overall term of imprisonment because Hernandez-Muniz's concurrent sentence for his illegal reentry conviction exceeds the modified sentence for his violation of § 1324(a)(1)(A)(ii) and (v)(ii).").

No. 21-10620

\*\*\*\*\*

No jurisdictional bar prevents this Court from correcting this error.[18] With respect, to these eyes, refusing to do so works a manifest injustice without principled justification.

I accept the necessity of maintaining the guardrails of our court with its myriad rules of preclusion, but I would correct this error—and in doing so would be attending these rules, enabling their function without blinking at an injustice we are duty-bound to correct. This is not the pursuit of justice and fairness in the abstract. It is simply a citizen's government refusing to enforce a prison sentence it confesses is illegal.

With respect, I must DISSENT from affirming Bubu's sentence for Count 3.

---

[18] *See United States v. Huntsberry*, 956 F.3d 270, 282 n.4 (5th Cir. 2020) (holding "we have jurisdiction to review even unpreserved arguments"); *United States v. Arellano-Banuelos*, 912 F.3d 862, 865 n.2 (5th Cir. 2019) (noting that while "'[t]he proper time to closely examine the record and develop legal defenses is before the completion of briefing,'" and that "[w]e are even more reluctant to consider arguments raised after oral argument is complete and the case has been submitted for decision" because "[t]he proper time to closely examine the record and develop legal defenses is before the completion of briefing, not in the months after oral argument," the Court retains discretion to consider such issues where "'exceptional circumstances'" exist (quoting *Martinez v. Mukasey*, 519 F.3d 532, 545 (5th Cir. 2008); and then quoting *Silber*, 370 U.S. at 718)); *United States v. Guillen-Cruz*, 853 F.3d 768, 777 (5th Cir. 2017) ("Whether we will consider an unpreserved argument is a matter of discretion.").