# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 25, 2024

Lyle W. Cayce
Clerk

———————

No. 23-30069

———————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ELLIOTT STERLING,

*Defendant—Appellant*.

———————————————————

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:20-CR-52-1

———————————————————

Before HIGGINBOTHAM, SMITH, and HIGGINSON, *Circuit Judges*.
STEPHEN A. HIGGINSON, *Circuit Judge*:

In this criminal case, appellant Elliott Sterling raises several Sixth Amendment claims in support of his bid to overturn his conviction and sentence following a jury trial in which he appeared *pro se*. As a review of the record indicates that the district court was conscientious in its inquiries throughout the proceedings, we find no merit to Sterling's procedural or substantive challenges and, accordingly, AFFIRM.

No. 23-30069

## I.

## A.

For over two years, from approximately September 2017 through November 2019, Elliott Sterling engaged in a complex scheme that took advantage of the Department of Education's Federal Student Aid (FSA) Program, which financially assisted qualified students in obtaining a college education, to fraudulently obtain loan and grant funds intended for students. The first step for obtaining FSA funds was to complete a Free Application for Federal Student Aid (FAFSA) and provide information to ensure that the applicant would meet eligibility requirements—including, among others, that they had a high school diploma or equivalent, were enrolled in a DOE-approved institution, and were in financial need.

Sterling committed extensive fraud in connection with the numerous FAFSA applications he submitted on behalf of students, both real and fictional: He not only concealed his identity as a paid preparer on the forms, but also falsely represented the eligibility, qualifications, and academic history of students who were applying for admission to Baton Rouge Community College (including forging high school diplomas), and paid people to impersonate students to the Baton Rouge Community College financial aid office. All told, the Department of Education disbursed $2,760,422 in loans and grants for a total of 262 students due to Sterling's unlawful scheme. Some of those students were unable to obtain credit as a result of the fraudulent student loan that Sterling obtained in their names; nearly all 262 students' credit scores were adversely affected due to the outstanding amounts on the fraudulent loans in their names.

Sterling also committed fraud in connection with Sterling Educational Consulting (SEC), the educational consulting business that he established and incorporated. In 2020, he submitted an application to the Small Business

2

No. 23-30069

Administration's Economic Injury Disaster Loan Program, in which he falsely represented SEC's finances and concealed a prior felony conviction. The Small Business Administration approved Sterling for a $90,000 loan, a portion of which Sterling used for unauthorized purposes.

For the activities described above, Sterling was ultimately indicted for seven counts of wire fraud in violation of 18 U.S.C. § 1343; two counts of financial aid fraud in violation of 20 U.S.C. § 1097; and six counts of engaging in monetary transactions involving property derived from specified unlawful activity in violation of 18 U.S.C. § 1957. The court appointed Brent M. Stockstill to represent Sterling under the Criminal Justice Act (CJA). Less than two months later, Sterling wrote a letter to the court listing his grievances with Stockstill, , which the district court construed as a motion to appoint new counsel.[1] After a hearing, the court denied that request, and Sterling elected to proceed *pro se*. Following two hearings on the issue, the district court found that Sterling competently waived his right to counsel and allowed him to proceed *pro se* in his own defense—including at a later competency hearing and at trial. After a 9-day jury trial, Sterling was convicted on all counts. The district court denied Sterling's post-trial counsel's motion for a competency evaluation, and sentenced Sterling to 132 months of imprisonment, followed by a 3-year term of supervised release.

Sterling timely appealed, presenting five issues on appeal: (1) the district court's denial of his motion for substitute counsel, (2) the district court's determination that he validly waived counsel, (3) the district court's permitting him to proceed *pro se* at his own competency hearing, (4) the

---

[1] Although Sterling's motion for new counsel was decided by a magistrate judge, none of Sterling's claims turns on the distinction between the magistrate and district court judge. For ease, therefore, this opinion will refer to the magistrate judge's actions as actions of the district court.

district court's determination that he was competent to proceed *pro se* at trial, and (5) the district court's denial of his request for a presentencing competency hearing. Each is addressed in turn.

## II.

### A.

Sterling first appeals from the district court's denial of his motion for substitute counsel, arguing that the refusal to appoint another CJA lawyer to replace Stockstill was a violation of Sterling's Sixth Amendment rights.

### i.

Claims of violations of the Sixth Amendment are reviewed *de novo*. *United States v. Simpson*, 645 F.3d 300, 307 (5th Cir. 2011). In the absence of a finding of a Sixth Amendment violation, however, "the trial court's refusal to appoint substitute counsel is reviewed for an abuse of discretion." *Id.* (citing *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973)).

"Although an indigent criminal defendant has a right to be represented by counsel, he does not have a right to be represented by a particular lawyer, or to demand a different appointed lawyer except for good cause." *Young*, 482 F.2d at 995 (citation omitted). In this context, a defendant can establish good cause for substituting his lawyer by showing "there is a substantial . . . problem affecting the [lawyer's] ability to represent the defendant," *United States v. Mitchell*, 709 F.3d 436, 441 (5th Cir. 2013), such as "a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict," *Young*, 482 F.2d at 995 (citation omitted). In addition, "[i]f a court refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction a court refuses to replace the

attorney, the defendant may then properly claim denial of his Sixth Amendment right." *Id.* (citation omitted).

ii.

Sterling makes three main arguments as to why the district court erred. First, he claims the district court's inquiry into Sterling's dissatisfaction with Stockstill was inadequate, improperly focusing more on qualifications and ability as an attorney, rather than Sterling's concerns about communication and the quality of the attorney-client relationship. Second, Stockstill's Facebook friendship with John McLindon, the "attorney who represented the officers who killed . . . [Sterling's] cousin, [Alton]," allegedly posed an irreconcilable conflict. According to Sterling, it also furthered Sterling's concern that he was being selectively prosecuted for "publicly speaking out against the Department of Justice for its handling of [Alton's] case." Third, the request for substitute counsel was made well before trial, so denial of the timely request was reversible error.

As to the first, the record reveals that the district court conducted extensive questioning over the course of a 47-minute hearing to explore Sterling's concerns. These included the three grievances raised in Sterling's letter to the court: the difficulty of communication between Stockstill and him; his frustrations about discovery; and the conflict regarding Stockstill's relationship with McLindon. As to discovery, the court inquired into the potential reasons for delay in discovery, whether discovery that had been received was made available to Sterling, and even into administrative details such as Sterling's preference for having paper copies of the discovery, ultimately concluding there were no issues. As to communication, the court inquired into the frequency of communication between Sterling and Stockstill, confirming that they still spoke and that Stockstill planned to communicate more after he had the chance to review the discovery. And as

to the alleged conflict of interest, the court asked Stockstill about his relationship with McLindon, and probed deeper into the nature of Sterling's concern, finding that Stockstill had no meaningful relationship with McLindon—and, above all, that "there [was] no actual conflict of interest." Throughout, the court was conscientious in evaluating Sterling's concerns to its satisfaction, which was reflected in the comprehensive detail included in the written order denying the motion. We are satisfied that this inquiry allowed the court "to assess if there [wa]s a problem that could affect the lawyer's ability to represent the defendant." *United States v. Quinn*, 826 F. App'x 337, 341 (5th Cir. 2020).

As to the second—Sterling's allegation of irreconcilable conflict—we also find no error. The court concluded that Stockstill's relationship with McLindon was practically nonexistent and "would have no bearing on Mr. Stockstill's representation in [Sterling's] case."[2] Sterling nonetheless argues that his mistrust of and conflict with Stockstill was so deep that Sterling was presented with an unconstitutional "Sophie's Choice" and, under those circumstances, effectively driven to *pro se* representation. But as is evident even in the authorities that Sterling invokes, more is required than the dislike or distrust of which Sterling complains to constitute an irreconcilable conflict. His client-attorney relationship with Stockstill was not "a stormy one with quarrels, bad language, *threats, and counter-threats*," *United States v. Williams*, 594 F.2d 1258, 1260 (9th Cir. 1979),[3] nor was Stockstill a lawyer

---

[2] As McLindon was a member of the CJA panel, that professional association would be shared by *any* replacement CJA counsel the court could appoint for Sterling.

[3] Sterling also alleged that Stockstill stated he "wasn't hired to win" the case (which Sterling interpreted as Stockstill's statement that he would not try to win the case), but this is a representation that Stockstill refuted (Stockstill explained that he stated that he could not guarantee winning the case in light of its complexity and the government's evidence).

"with whom [Sterling] would not cooperate, and with whom [Sterling] would not, in any manner whatsoever, communicate," *Brown v. Craven*, 424 F.2d 1166, 1169 (9th Cir. 1970); *see also United States v. Mullen*, 32 F.3d 891, 897 (4th Cir. 1994) (finding irreconcilable conflict where defendant did not speak to attorney in the entire month before trial—including the day before—and where the lawyer's "own description of his preparation tend[ed] to show that the lack of communication hampered his ability to put together an adequate defense"). Of course, a defendant need not always show a near total lack of communication with his lawyer to prove irreconcilable conflict, and the district court would have been within its discretion to permit Sterling to substitute counsel. But the district court was not *required* to do so, even if there was ample time for counsel to be substituted.[4] As a result, there was no Sixth Amendment violation in the district court's denial of Sterling's motion for substitute counsel.

**B.**

Sterling next challenges the district court's finding that Sterling voluntarily, knowingly, and intelligently waived counsel when he insisted on proceeding *pro se*.

i.

On January 26, 2021, nearly three months after Sterling's request for new counsel was denied, Stockstill filed a motion for Sterling to proceed *pro*

---

[4] Sterling's third argument—that the request for substitute counsel was made well before trial, so denial of the timely request was reversible error—is also unavailing. Although there are cases where courts deny motions to substitute counsel because they would impact the case schedule, Sterling cites no authority to establish the converse—that the absence of an impact on the schedule operates as an independent legal basis for compelling substitution. Indeed, the "good cause" showing required of defendants would suggest there is no automatic right to substitute counsel upon a timely request for such. *Young*, 482 F.3d at 995.

*se*. The court scheduled two hearings for the matter. In the first hearing on February 24, 2021, the court inquired after Sterling's dissatisfactions with Stockstill, and warned Sterling of the dangers of self-representation. After that first hearing concluded, the court set a second hearing on Sterling's motion to proceed *pro se* and appointed another attorney, Harry L. Daniels, III, to serve as co-counsel with Stockstill. Nonetheless, during the second hearing on March 16, 2021, Sterling expressed that he wanted to represent himself, and the court, finding him competent to make the decision, ultimately granted the motion. A third lawyer, Gideon T. Carter, was thereafter appointed as Sterling's stand-by counsel.

### ii.

The Sixth Amendment guarantees defendants the right to counsel "at all critical stages of the criminal process." *United States v. Mesquiti*, 854 F.3d 267, 271 (5th Cir. 2017) (quoting *Iowa v. Tovar*, 541 U.S. 77, 80–81 (2004)). As we have noted, the right to counsel "is not limitless": "A defendant is entitled to counsel capable of rendering competent, meaningful assistance," but "[n]o defendant has a right to more." *United States v. Capistrano*, 74 F.4th 756, 774–75 (5th Cir.) (cleaned up) (quoting *McQueen v. Blackburn*, 755 F.2d 1174, 1178 (5th Cir. 1985)), *cert. denied*, 144 S. Ct. 516 (2023), *reh'g denied*, 144 S. Ct. 882 (2024), and *cert. denied sub nom. Thomas v. United States*, 144 S. Ct. 517 (2023). Moreover, right to counsel can be waived, as "[a] criminal defendant [also] has a Sixth Amendment right to conduct his own defense, even if he does so to his detriment, if his decision to do so is voluntary, knowing, and intelligent." *United States v. Romans*, 823 F.3d 299, 313 (5th Cir. 2016) (citing *Faretta v. California,* 422 U.S. 806, 833–34, 835–36 (1975)).

"Sixth Amendment challenges to the validity of a waiver of counsel are reviewed *de novo*." *Capistrano*, 74 F.4th at 774 (quoting *Mesquiti*, 854 F.3d

at 271). "Where a fundamental constitutional right, such as the right to counsel, is concerned, courts indulge every reasonable presumption against waiver." *Id.* (quoting *Mesquiti*, 854 F.3d at 272). In the absence of "a clear election to forgo counsel, a court should not quickly infer that a defendant unskilled in the law has waived counsel and has opted to conduct his own defense." *Id.* (internal quotation marks omitted) (quoting *Burton v. Collins*, 937 F.2d 131, 133 (5th Cir. 1991)).

For a proper waiver, "[t]he defendant must 'unequivocally inform the court of his desire to represent himself,' and the court must determine, through a *Faretta* hearing, whether the defendant is 'knowingly and intelligently' choosing to represent himself." *Romans*, 823 F.3d at 313 (quoting *United States v. Cano*, 519 F.3d 512, 516 (5th Cir. 2008)). This determination can come in the form of either "clear conduct" or an "express statement" by the defendant. *Mesquiti*, 854 F.3d at 272. Moreover, in light of the limits on the right, a defendant's "refusal without good cause to proceed with able appointed counsel" may also "constitute[] a voluntary waiver of the right to counsel," so long as that refusal "take[s] the form of a persistent, unreasonable demand for dismissal of counsel." *Capistrano*, 74 F.4th at 774 (internal quotation marks and citations omitted).

Sterling argues his constitutional right to counsel was violated when the court accepted his waiver, which was made neither clearly and unequivocally, nor voluntarily, knowingly, or intelligently.

### iii.

We first consider whether Sterling's waiver was clear and unequivocal, a requirement we have "strictly construed." *Burton*, 937 F.2d at 133. Sterling argues that it was obvious that his main objective during the *Faretta* hearings was to obtain *different* counsel, rather than to represent himself. In particular, he argues that in the context of his repeated requests

for new counsel, his "inquiries about his assets so that he could hire an attorney" serve as a "simple qualifying statement" sufficient "to create a vitiating ambiguity."

Although Sterling argues that any of his "*initial* requests to represent himself . . . were subsequently waived by his continued assertions to the district court that he wanted counsel," the record does not bear this out. On the contrary, Sterling's actions reflect a commitment to *pro se* representation. Sterling took the affirmative step of having his lawyer actually file a motion for him to proceed *pro se*. He also continued to insist on *pro se* representation—commenting that he himself would do the best job—and did so across not one but *two Faretta* hearings, nearly a month apart, during which the court emphasized both the seriousness of the crimes with which Sterling was charged and the difficulty of defending the case, and repeatedly checked if Sterling was sure of his decision. Unlike disgruntled comments made in the middle of trial that could reasonably be interpreted as indicating "dissatisfaction with his attorney and nothing more," there is not "more than one reasonable interpretation" of the totality of Sterling's actions. *Burton*, 937 F.2d at 134. Indeed, Sterling's clear conduct and express statements are distinct from the types of requests that this court has found not to be clear and unequivocal: Sterling's words and actions cannot be construed as "verbal protests meant to express [the defendant's] disagreement with his detention and the whole notion of a trial on his guilt or innocence rather than an assertion of the right to self-representation," *United States v. Ibarra*, 236 F. App'x 10, 14 (5th Cir. 2007) (per curiam), nor "a request to fire his appointed attorney, but not a clear and unequivocal request to represent himself," *United States v. Long*, 597 F.3d 720, 725 (5th Cir. 2010).

Our conclusion is not altered by Sterling's references to his assets, which he maintains he made to inquire into hiring an attorney. Contrary to

No. 23-30069

Sterling's argument, those references do not equate to qualifying language that either contradicts Sterling's request to proceed *pro se* or otherwise render it ambiguous. In *Johnson v. McCotter*, for instance, we found a defendant's request ambiguous where contradictory, qualifying language led to a reasonable assumption that the defendant was actually accepting counsel:

> Is it written in the law that I can not represent myself? You see, I would choose to represent myself, providing I had the proper equipment. . . .
>
> . . . Please understand, I do not need a lawyer to talk for me, or to question my witness.
>
> It is said I will have to [bear] with the decision of the court and a court appointed attorney. If at any time, my attorney appears not to be representing me properly, I will have him removed from my case immediately!

803 F.2d 830, 833 (5th Cir. 1986) (per curiam). No similar ambiguity is present here. That Sterling would prefer a lawyer *of his choosing* is obvious. But as the denial of substitute counsel was justified, Sterling's *preference* for another attorney does not negate the fact that, as between a court-appointed lawyer and proceeding *pro se*, he clearly and repeatedly made known that his preference was the latter option.[5] This is even more starkly supported by Sterling's repudiation of any appointed counsel—evinced through his insistence on representing himself even after the court had appointed additional co-counsel (Daniels) to assist him. In light of these explicit and continued actions, we therefore agree that Sterling's waiver was clear and unequivocal.

---

[5] Moreover, the instances in which Sterling contests his inability to use funds to hire an attorney seem more to be protests regarding his inability to access his funds and his general preference for private over court-appointed attorneys.

11

iv.

We next evaluate whether Sterling's waiver was voluntary, knowing, and intelligent.

"Because of the vast differences from case to case, and defendant to defendant, a district court must consider the totality-of-circumstances in determining whether a defendant has properly waived his right to counsel." *United States v. Virgil*, 444 F.3d 447, 453 (5th Cir. 2006) (citing *United States v. Davis*, 269 F.3d 514, 518 (5th Cir. 2001)). This inquiry involves considering "the defendant's age and education, and other background, experience, and conduct" and "the stage of the proceedings and the setting in which the waiver is advanced," as well as ensuring "that the waiver is not the result of coercion or mistreatment of the defendant," and "that the accused understands the nature of the charges, the consequences of the proceedings, and the practical meaning of the right he is waiving." *Id.* (citations omitted). The ultimate goal of the *Faretta* hearing and the district court's evaluation is to be sure that the defendant is "made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with his eyes open." *United States v. Joseph*, 333 F.3d 587, 590 (5th Cir. 2003) (internal quotation marks and citations omitted).

Sterling argues that the waiver was involuntary due to improper pressure created by the court's repeated statements, during the prior hearing on the motion to substitute counsel, that if Sterling did not want to accept Stockstill's competent representation, he could represent himself. This is an extension of Sterling's earlier argument that the district court erred in its refusal to grant substitute counsel. As we have already discussed, the district court properly concluded that Sterling had no good cause requiring substitute counsel. While "a court cannot force a defendant to choose between

constitutionally deficient or disqualified counsel and no counsel at all, [a] defendant's refusal without good cause to proceed with able appointed counsel constitutes a voluntary decision to proceed pro se." *Romans*, 823 F.3d at 313 (internal quotation marks and citation omitted); *see Capistrano*, 74 F.4th at 774. Therefore, Sterling's "persistent, unreasonable demand for dismissal of counsel" constituted a voluntary waiver. *Capistrano*, 74 F.4th at 774 (citation omitted); *see Romans*, 823 F.3d at 312–13 (concluding that "[a]lthough it [wa]s evident that [the defendant] mistrusted and disliked [his lawyer]," the defendant's waiver was voluntary even though "it occurred only after the district court refused to substitute counsel").

Sterling next argues that the waiver was neither knowing nor intelligent because the district court gave only generalized warnings about the dangers of self-representation and failed to sufficiently inquire into Sterling's background and medical history. But these arguments, too, are unsupported by the record. The district court did inquire into Sterling's education and background, ensure Sterling understood the nature and severity of the charges against him, and explain in detail the dangers of self-representation.[6] The district court specifically delved into the disadvantages of proceeding *pro se*, emphasizing that Sterling's comparative lack of experience and ignorance of the rules might hinder his effective participation in the trial, and cautioning that even for "an experienced trial lawyer, by representing themselves [they] often do so at a great disadvantage and they themselves are found guilty. . . . [V]ery often [*pro se* defendants] are found guilty because of the challenges presented by that dual role [of defendant and lawyer]." Despite these warnings, Sterling answered affirmatively that he was not being

---

[6] Moreover, the court's questions closely followed those recommended in the Benchbook for U.S. District Court Judges. *See United States v. Jones*, 421 F.3d 359, 363–64 (5th Cir. 2005) (approvingly citing the Benchbook).

"coerce[d]" into proceeding pro se, he understood that the district court believed "a trained lawyer would defend [him] in this matter far better than [him] defending [him]self," but he was nonetheless willing to "bear the risk" of doing so.

The district court also clearly took into consideration Sterling's mental health. At Sterling's initial appearance, the government expressed to the court that it had been reported to the government that Sterling had talked about suicide when he learned of the prosecution's investigation. Accordingly, one of Sterling's special conditions of release was medical or psychiatric treatment "as deemed necessary by pretrial services." At the direction of pretrial services, Sterling was evaluated twice: once on September 10, 2020, by a licensed clinical social worker from Baton Rouge Behavioral Health, and another time on October 23, 2020, by an advanced practice registered nurse from Baton Rouge Mental Health Clinic.[7] In those evaluations, Sterling denied any mental health symptoms or psychiatric history, and a mental status evaluation indicated that his functioning was normal. The social worker did diagnose Sterling with "acute stress reaction," but Sterling declined psychotherapy that was offered to deal with stress.

During the first *Faretta* hearing, the district court asked whether Sterling had "been under the care of a psychiatrist or a mental health counselor for any reason," and asked follow-up questions about the evaluation that pretrial services had ordered for Sterling shortly after his initial appearance. Upon realizing that neither Sterling nor Stockstill had information about that evaluation, the district court indicated it wanted to

---

[7] While the record does not contain the actual report associated with those evaluations, the findings of those evaluations are summarized in a competency report prepared by Dr. John W. Thompson and in the PSR.

follow up and review the evaluation report, and declined to rule during the hearing. The court then scheduled a second *Faretta* hearing, prior to which it received and reviewed that evaluation. Across both hearings, the district court covered Sterling's interactions with doctors, the medication he was prescribed, and other aspects of his medical history. This series of inquiries clearly demonstrates consideration of Sterling's mental health and is far more comprehensive than those at issue in the cases that Sterling invokes. *See, e.g.*, *United States v. Klein*, 420 F. App'x 471, 472 (5th Cir. 2011) (per curiam) (noting that the district court granted a waiver after only "a terse colloquy" of "essentially . . . only two questions": a confirmation of the defendant's "understanding (1) that he was not a lawyer and (2) that the court would not assist him in his defense"); *id.* (explaining that the information regarding the defendant's mental instability "should have raised a red flag for further questioning, or at least spurred the court to give more specific warnings about the disadvantages of *pro se* representation"). We therefore find that Sterling's waiver was voluntary, knowing, and intelligent.

## C.

Sterling's third issue on appeal presents the question of whether it is lawful to allow a criminal defendant to represent himself at his own competency hearing.

### i.

On July 13, 2021, approximately four months after permitting Sterling to proceed *pro se*, the court *sua sponte* ordered—without elaboration—a competency examination of Sterling, to be conducted by Dr. John W. Thompson. This evaluation was to include five topics, including Sterling's "history and present symptoms"; "a description of the psychiatric, psychological, and medical tests that were employed and their results"; "the examiner's findings"; "the examiner's opinions as to diagnosis, prognosis";

and "whether Defendant is suffering from a mental disease or defect rendering him mentally incompetent." Dr. Thompson conducted his examination and issued a report concluding that Sterling had "no psychiatric diagnoses," and was "competent to represent himself." The court subsequently held a competency hearing, during which the report was introduced and Dr. Thompson was examined by both parties. The district court orally ruled that Sterling was competent to proceed to trial *pro se* at the conclusion of the hearing, which it put in writing the next day.

ii.

Whether a *pro se* litigant can continue to represent himself at a competency hearing is an issue on which other circuits are divided, and it is an issue of first impression for our circuit. Accordingly, we have not previously opined on the appropriate standard of review for a district court's decision to allow waiver of counsel for a competency hearing. In light of the fundamental importance of the right to counsel at critical stages of the criminal process, however, we adopt the general standard for constitutional challenges and apply *de novo* review.[8]

iii.

On appeal, the parties press competing facets of the Sixth Amendment. On the one hand, the Sixth Amendment guarantees representation by competent counsel at all critical stages of a prosecution. This right is so paramount that there are also statutory protections that

---

[8] In so doing, we follow "every federal court of appeals to take up the question"—the Third, Fourth, Sixth, Eighth, Ninth, Tenth, and D.C. Circuits—in deeming a competency hearing a "critical stage" of trial. *United States v. Ross*, 703 F.3d 856, 874 (6th Cir. 2012) (citing Ronald A. Parsons, Jr., *Being There: Constructive Denial of Counsel at a Competency Hearing as Structural Error Under the Sixth Amendment*, 56 S.D. L. Rev. 238, 242 & n.31 (2011)).

further underscore it. Congress has mandated, for instance, that "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," 18 U.S.C. § 4241(a), a court "shall" order a hearing, and that defendant "shall be represented by counsel" at this hearing, 18 U.S.C. § 4247(d). Sterling emphasizes that this fundamental Sixth Amendment guarantee was violated when the district court permitted him to proceed *pro se* at his own competency hearing.

At the same time, however, the Sixth Amendment also guarantees the right to self-representation, the improper denial of which also constitutes reversible error. The right to self-representation, the government argues, would be implicated by a refusal to permit the defendant to represent himself—particularly under circumstances where, as here, a district court has already previously determined there was a valid waiver.

In the absence of controlling precedent in this circuit, the parties invoke competing decisions of our sister circuits: Sterling urges us to follow the approach taken by the Sixth Circuit in *United States v. Ross*, 703 F.3d 856, 867 (6th Cir. 2012), whereas the government urges us to follow *Wise v. Bowersox*, 136 F.3d 1197 (8th Cir. 1998) and *United States v. Morrison*, 153 F.3d 34 (2d Cir. 1998) and hold that the Sixth Amendment does not require representation by counsel at a competency hearing after a prior valid waiver.

In *Ross*, which presents the most thorough treatment of the issue, the defendant "exhibited bizarre and paranoid behavior which led to the withdrawal of three court-appointed attorneys." 703 F.3d at 865. While represented by his third court-appointed attorney, the defendant moved to represent himself, which prompted the government to move for a

competency examination. *Id.* The court denied both motions. As to the motion to proceed *pro se*, it made no findings on the defendant's ability to represent himself. *Id.* And on the motion for competency evaluation, the court found that the defendant's "signs of delusion and paranoia and his inability to get along with his lawyers did not give reasonable cause to order a psychiatric exam at that time," but urged the lawyers to alert the court if there were any "additional developments that cause Counsel to question th[at] conclusion[]." *Id.* Just over a week after this denial, the defendant filed yet another motion to substitute counsel; the court denied substitution but found, after an inquiry into the defendant's "knowledge and ability to represent himself," that he had validly waived counsel. *Id.* at 865–66. The following month, the government filed a *second* motion for a competency examination and hearing, which was granted. *Id.* at 866. The defendant was not reappointed counsel before the hearing, and after considering the report of a court-appointed psychologist and its own observations of the defendant, the court deemed him competent to stand trial. *Id.*

On these facts, the Sixth Circuit concluded that the district court had erred in "failing to appoint counsel to represent [the defendant] at the [competency] hearing" and allowing him to proceed *pro se* "despite having questions about his competency." *Id.* at 869. In so doing, it expressly rejected the argument the government presses here—that "the court's prior determination" of the defendant's competency to waive counsel "carried over to the competency hearing." *Id.* As "a finding of competency at one point of the proceedings may be overcome later by further evidence that a defendant is not competent," *id.* (citing *Drope v. Missouri*, 420 U.S. 162, 181 (1975), "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial," *id.* (quoting *Drope*, 420 U.S. at 181). Under this understanding

of the need for constant vigilance, the court found that the right to counsel necessarily superseded the right to self-representation, as requiring counsel for a defendant under these circumstances would pose "no greater a denial of a defendant's right to self-representation than that of any other defendant whose waiver has been found not to be knowing and intelligent." *Id.* at 870.

At bottom, the Sixth Circuit reasoned that this position best comported with the "common-sense viewpoint that a defendant cannot represent himself at his own competency hearing, the purpose of which is to determine whether a defendant understands and can participate in the proceedings in the first place"—necessarily an antecedent inquiry. *Id.* at 869 (citing cases where courts "have concluded that a defendant may not be permitted to waive counsel while the issue of competency is pending"); *see United States v. Purnett*, 910 F.2d 51, 55 (2d Cir. 1990) ("Logically, the trial court cannot simultaneously question a defendant's mental competence to stand trial and at one and the same time be convinced that the defendant has knowingly and intelligently waived his right to counsel."); *United States v. Martin*, 608 F. App'x 340, 343 (6th Cir. 2015) ("When a criminal defendant's competency to stand trial has been challenged, the validity of the defendant's waiver of counsel is suspended until the issue of his or her competency is resolved.").[9] Particularly in light of the district court's own finding, made at the hearing on the second competency motion, that "there [wa]s reasonable cause to believe that [the defendant] may not be able to

_____

[9] The Sixth Circuit also rejected the government's attempt to distinguish these cases on the basis that the defendants therein "had not actually been found competent to waive counsel before they were allowed to proceed pro se into their competency hearings," because "the court's continuing obligation to assess competency and resulting actions removes the distinction." *Ross*, 703 F.3d at 870.

properly assist in his defense," *id* at 869, the Sixth Circuit held that it was error to allow him to proceed *pro se* at the hearing.

In contrast to *Ross*, the Second and Eighth Circuits have held under certain circumstances that representation by counsel at a competency hearing is not mandated given a valid prior waiver of counsel. In *Bowersox*, the defendant moved to represent himself during pretrial proceedings. 136 F.3d at 1202. The trial court conducted a hearing on his competence, ultimately finding him competent to proceed *pro se* and assigning him standby counsel. *Id.* at 1202–03. The following month, "at the instigation of [that] standby counsel," who believed defendant to be incompetent, the court held a competency hearing. *Id.* at 1203. The Eighth Circuit found that the defendant's lack of counsel at this hearing was not error, because, "after a thorough hearing on [his] competence, the trial court properly permitted him to exercise that right";[10] therefore, the defendant "already properly was representing himself," and had "not request[ed] the assistance of a lawyer" for that hearing. *Id.* Notably, moreover, though both parties "attempted to demonstrate [the defendant's] competence, *the contrary point of view also was well represented*" by standby counsel, who "attempted to show [the defendant's incompetence] at the hearing" by "speak[ing] and [] examin[ing] both of the experts who testified." *Id.* (emphasis added).

Citing *Bowersox* approvingly, the Second Circuit explained in *Morrison* that although "a trial court [that] has cause to doubt the competency of the defendant . . . must appoint counsel to serve until the issue with respect to competency is resolved," 153 F.3d at 47 (citing *United States v. Purnett*, 910 F.2d 51, 56 (2d Cir. 1990)), the court had "declined to extend *Purnett* to

---

[10] The "thorough hearing" to which *Bowersox* refers is the hearing on the defendant's competency to proceed *pro se*, analogous to Sterling's two *Faretta* hearings.

No. 23-30069

require appointment of counsel where, as here, the district court held a hearing as a precautionary measure after making an initial determination of the defendant's competency based on psychiatric reports and the court's own observation," *id.* (citing *United States v. Nichols*, 56 F.3d 403, 414–15 (2d Cir. 1995)). In other words, a trial court was not required "to reappoint counsel to a pro se defendant *every time* it revisits the issue of competency." *Id.* (emphasis added) (quoting *Nichols*, 56 F.3d at 415). Because the defendant in *Morrison* challenged his lack of counsel during a *second* competency hearing, the Second Circuit declined to find that the trial court had erred in permitting the defendant to proceed *pro se*.

We agree with the Sixth Circuit that, due to the court's continuous duty to ensure the defendant's competency, *Drope*, 420 U.S. at 181, and because "a finding of competency at one point of the proceedings may be overcome later by further evidence that a defendant is not competent," *Ross*, 703 F.3d at 869, a determination of competency cannot stretch indefinitely to displace the necessary investigation during subsequent competency hearings.[11] Rather, where a court has reasonable cause to question the defendant's competency, it must appoint counsel for the defendant until that doubt is extinguished. *See Purnett*, 910 F.2d at 56.[12]

---

[11] The position we articulate today appears more flexible than that taken by the Second Circuit, given its declaration that it will not "require a trial court to reappoint counsel to a pro se defendant every time it revisits the issue of competency." *Morrison*, 153 F.3d at 47.

[12] Because there was no meaningful adversarial testing at the competency hearing of Dr. Thompson's expert opinion that Sterling was competent, we need not reach the question of whether lack of counsel for the defendant may nonetheless be excused if "meaningful adversarial testing" otherwise occurs. *See Ross*, 703 F.3d at 872 (discussing *Bowersox* and adopting the "meaningful adversarial testing" standard for assessing whether representation by standby counsel is sufficient to cure deprivation of counsel at competency hearing). It is along this dimension that our case differs from *Bowersox*, *see* 136

No. 23-30069

With that said, we cannot agree with Sterling that, on the specific facts before us, the record shows the district court had cause to doubt his competence. Sterling argues that such a conclusion is warranted from the mere fact that the district court *sua sponte* ordered the hearing. In certain instances, such an order may constitute circumstantial evidence tending to show what Sterling argues. Yet here, as both parties acknowledge, the record is devoid of any reasons for that order, because the district court did not provide any. The court did not make a finding that "there is reasonable cause to believe that [Sterling] may not be able to properly assist in his defense," *Ross*, 703 F.3d at 869, just as it did not "express[] renewed concern regarding [Sterling's] competence" and "wonder whether [he] was delusional" because of "investigations that [Sterling] requested to be performed," *Morrison*, 153 F.3d at 40.[13] Nor is Sterling's a case where the opposing party filed repeated motions for a competency evaluation. *See Ross*, 703 F.3d at 867–68. The absence of any corroborating evidence suggesting there was sound reason to doubt Sterling's competency therefore admits of the possibility that the district court ordered the evaluation as a "precautionary measure." *Morrison*, 153 F.3d at 47. Furthermore, the district court conducted thorough *Faretta* hearings—during which the court inquired after and considered the results of a medical evaluation before rendering its decision—and the record does not reveal bizarre behavior tending to cast doubt on the defendant's competency.

---

F.3d at 1203, which we read to be less categorical than the Second Circuit's approach in *Morrison*.

[13] Indeed, as the district court would later state (during its December 2022 hearing to determine whether a presentencing competency evaluation of Sterling was necessary), there was no evidence that Sterling was incompetent to proceed to trial *before* the evaluation by Dr. Thompson, nor any indication that he had a history of irrational behavior.

22

In sum, while we hold that as a general matter, a district court that has reasonable cause to question a defendant's competence errs when it allows that same defendant to appear *pro se* at his own competency determination, we conclude that the district court did not err in the limited facts of this case. Under these specific circumstances, the record presents insufficient indication that there was cause to doubt Sterling's continued competency. Accordingly, the district court was not required to appoint counsel for Sterling for the competency hearing.

### D.

Sterling also challenges the district court's determination, at the conclusion of the competency hearing, that he was in fact competent to represent himself at trial.

"Due process prohibits the prosecution of a defendant who is not competent to stand trial." *Dunn v. Johnson*, 162 F.3d 302, 305 (5th Cir. 1998) (citations omitted). A defendant is mentally competent to stand trial if he has "the 'present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'has a rational as well as factual understanding of the proceeding[] against him.'" *Id.* (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)). "A district court can consider several factors in evaluating competency, including, but not limited to, its own observations of the defendant's demeanor and behavior; medical testimony; and the observations of other individuals that have interacted with the defendant." *Simpson*, 645 F.3d at 306 (citing *Joseph*, 333 F.3d at 589).

In appeals challenging a district court's determination that a defendant is competent to stand trial, this court engages in "a species of clear error" review: "after 're-analyzing the facts and taking a hard look at the trial judge's ultimate conclusion,' we will reverse only if the finding was 'clearly

arbitrary or unwarranted.'" *Id.* (cleaned up) (quoting *Joseph*, 333 F.3d at 589).

Applying this standard, we cannot say the court's determination was either clearly arbitrary or unwarranted. Sterling raises three objections, all of which are unpersuasive. First, Sterling argues he had neither a sufficient rational or factual understanding of the proceedings to qualify as competent under *Dusky*. Though Sterling identifies certain behavior—such as having outbursts and pointing to specific jurors during trial—not only do these postdate the competency hearing, but Sterling also fails to show the bearing that that behavior would have on his "ability to consult with his lawyer with a reasonable degree of rational understanding" or his ability to have "a rational as well as factual understanding of the proceeding." *Dunn*, 162 F.3d at 305. Against the preponderance of the evidence indicating that Sterling was competent—such as Dr. Thompson's report and conclusion, including that Sterling "performed near perfect" on the competency test administered to him, and the district court's first-hand observation of Sterling's demeanor in court—the determination that Sterling was competent was not clearly unwarranted.

Sterling next argues that the district court improperly relied only on *Dusky*—which defines the standard test for competence to stand trial, *see* 362 U.S. at 402—but instead should have applied *Indiana v. Edwards*, which teaches that there can be a higher threshold of competency for proceeding *pro se* than for standing trial. 554 U.S. 164, 175–76 (2008). As a threshold matter, the district court clearly did contemplate *Edwards*, citing the case in its order. But even if we accept Sterling's characterization of the district court's analysis, the instances which *Edwards* identifies—that is, where "an individual may . . . satisfy *Dusky*'s mental competence standard, for he will be able to work with counsel at trial, yet at the same time . . . be unable to carry out the basic tasks needed to present his own defense without the help

of counsel," *Edwards*, 554 U.S. at 176–77—are "exceptional." *Panetti v. Stephens*, 727 F.3d 398, 414 (5th Cir. 2013). Sterling's case does not present those exceptional circumstances, as there is insufficient evidence on which to conclude that he was unable to fulfill any necessary "basic tasks." And even if it were such an exceptional case, the *permissive* holding in *Edwards* does not render the district court's determination arbitrary or unwarranted. *See id.* (explaining *Edwards* is best read as "*allowing* the [court] to insist on counsel" for someone who satisfies the *Dusky* standard, "but not requiring that the [court] do so"). Indeed, *Edwards* explains that the trial court is often in the best position to judge the matter. 554 U.S. at 177 ("[T]he trial judge, particularly one . . . who presided over one of [the defendant's] competency hearings and his two trials, will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant.").

Third, Sterling argues that Dr. Thompson's examination of Sterling "did not take into consideration his past mental health history," as his report does not include every detail in Sterling's history—largely because Sterling denied any symptoms or ailments during his interview. The defense argues this is inconsistent with Sterling's actual psychiatric history, as he reported "symptoms consistent with major depressive disorder and post-traumatic stress" "[a]s early as 2014." However, there is conflicting evidence, revealing that assessments from the medical professionals—such as the 2014 records from Our Lady of the Lake Regional Medical Center (OLOL)— concluded that Sterling "does not appear depressed" (even if he "report[ed] feelings of depression"), and he denied suicidal ideations or auditory hallucinations. But even if Dr. Thompson's report omitted certain instances of Sterling's reported depression, those omissions would not, in this context, change the ultimate competency determination. Dr. Thompson's report explicitly included in its sources of review the Behavioral Health Assessment

and Psychiatric Evaluation ordered by the court (as well as a conversation with Sterling), and does note Sterling's depressive symptoms—thus indicating that Sterling's depression factored into the report's analysis and final conclusion regarding Sterling's competency. As a result, Sterling has presented no evidence to suggest that the district court's competency determination was clearly arbitrary or unwarranted.

**E.**

Sterling's final issue on appeal concerns the district court's refusal to grant the motions for a competency evaluation and hearing prior to Sterling's sentencing.

i.

Trial concluded on March 16, 2022. About two weeks later, on March 30, 2022, Sterling enrolled attorneys from Longman Jakuback as his counsel, ending his *pro se* representation.

On June 16, 2022, in advance of sentencing, defense counsel moved for an examination of Sterling's competency, arguing that new medical developments warranted a reevaluation of Sterling's competency. The district court held an initial status conference on November 8, 2022. There, the defense counsel acknowledged that Sterling "goes through phases where he has an appearance of being very, very clear, very competent, very clearheaded," but added that he would at times "demonstrate[] to us . . . a complete lack of factual understanding as to where his case is or what actions we are taking on his behalf and then provide[] us with medical documentation that indicates, from physicians, from doctors . . . that he is unwell." Out of concern that it had not been provided with "all of the relevant evaluation reports," which it would need to determine the necessity of the competency evaluation, the district court adjourned the session and scheduled a follow-up hearing for December 13, 2022.

No. 23-30069

At the December hearing, the district court first heard from both parties. It then focused on the developments following Dr. Thompson's July 30, 2021 evaluation, and traced the chronology of the submitted medical records—a joint submission of over two thousand pages in total. The court emphasized that, although Sterling had had six medical evaluations after Dr. Thompson's evaluation,[14] there was only one diagnosis that noted a "major depressive disorder . . . with what could be psychotic features,"[15] and nothing in the evaluations contained evidence of a mental disease or defect that would render Sterling mentally incompetent to proceed in the case. Acknowledging the singular psychosis diagnosis and the diagnoses of depression, the court reasoned that the diagnoses by themselves were insufficient to overcome the other evidence of competency. It also noted that there was evidence that Sterling would discuss his case and his discontent with his potential sentence with medical personnel; that much of the additional medical history was self-reported following the guilty verdict; and therefore, that his episodes were likely "a reaction to the guilty verdict and likely sentence." The district court also explicitly covered the other factors it was required to consider, adding that its observations of Sterling's demeanor at trial corroborated the conclusion that Sterling was competent.

---

[14] This included a May 2022 evaluation at OLOL, a May 2022 evaluation at Bridge Center for Hope, a May 2022 evaluation at OLOL, a June 2022 evaluation at OLOL, a June–August 2022 evaluation at Oceans Behavioral Hospital, and an October 2022 evaluation at OLOL. It did not include the last November-December admission to OLOL, for which there were no records submitted and which the parties both agreed was outside the scope.

[15] In addition to the visits detailed in the district court's order, Sterling apparently also had a behavioral health assessment at Baton Rouge Behavioral Health on May 20, 2022, at which Sterling was diagnosed with a single episode of major depressive order, with psychotic features, and was ordered to be hospitalized for 72 hours. There were also a few other minor visits, though none as serious (or finding psychosis).

No. 23-30069

Based on this analysis, the district court orally denied the competency motion during the hearing, and followed with a written order nine days later. At the sentencing hearing on January 10, 2023, defense counsel again raised its belief that Sterling was "struggling with some very deep mental health concerns" and "very, very troubled mentally." The district court nonetheless sentenced Sterling and recommended that he be incarcerated in a facility capable of providing mental health treatment.

ii.

Under 18 U.S.C. § 4241(a), district courts are required to conduct a competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." *See United States v. McEachern*, 465 F.2d 833, 837 (5th Cir. 1972). "Whether 'reasonable cause' exists to put the court on notice that the defendant might be mentally incompetent is left to the sound discretion of the district court." *United States v. Davis*, 61 F.3d 291, 304 (5th Cir. 1995) (citation omitted); *Mitchell*, 709 F.3d at 440 ("This court recognizes that the trial court is in the best position to decide whether a competency hearing is necessary . . . ."). Accordingly, "[a]n abuse of discretion standard applies to [a] district court's failure to *sua sponte* conduct a mental competency hearing and its denial of the defense's motion for a mental competency evaluation." *United States v. Flores-Martinez*, 677 F.3d 699, 706 (5th Cir. 2012).

The mere existence of "mental or emotional problems or mental illness 'is not dispositive as to . . . competency.'" *United States v. Teijeiro*, 79 F.4th 387, 393 (5th Cir. 2023) (citation omitted). Instead, this court "consider[s] three factors to detect whether a court reversibly erred by failing

28

to hold a competency hearing *sua sponte*: (1) any prior medical opinion on competency, (2) the defendant's demeanor at trial, and (3) any history of irrational behavior." *Id.* (citing *United States v. Messervey*, 317 F.3d 457, 463 (5th Cir. 2002)).

### iii.

Upon review of the reasoning detailed by the district court and review of the medical records, we cannot say the district court's refusal to order another competency evaluation was an abuse of discretion.

The defense did provide evidence to establish that Sterling was suffering from certain mental illnesses—most predominantly, depression and stress, but also potentially psychosis. However, "[a] history of suicidality and depression . . . does not render a defendant incompetent" as a matter of law. *Austin v. Davis*, 876 F.3d 757, 780 (5th Cir. 2017); *see also Mata v. Johnson*, 210 F.3d 324, 330 (5th Cir. 2000) (explaining that even "a suicide attempt, *by itself*, is not necessarily sufficient to create 'reasonable cause' for a competency hearing"; "[i]nstead, that evidence must be weighed in conjunction with all other evidence presented with respect to a defendant's mental stability and competence" (citing *United States v. Davis*, 61 F.3d 291, 304 (5th Cir. 1995))).

Moreover, with all parties acknowledging that Sterling "has not been the most reliable narrator or forthcoming when it relates to his mental health history," it was not unreasonable for the district court to perceive Sterling's actions—including his self-submission to medical evaluations and expressed desire to seek help—as rational. As the government explicitly argued, and the court also alluded to, Sterling "did not report his history of depression prior to trial when he took the position that he was competent, but he did report his history of depression after trial when he took the position that he was not competent." "In other words," therefore, he "reported a history of mental

illness when it suited his purposes to do so, and he withheld information about his mental health history when that suited his purposes. Those actions were rational."

Here, the district court conducted a careful and thorough evaluation of the three factors to which this circuit looks: Sterling's lack of history of irrational behavior, his demeanor and behavior at trial, and medical records and opinions regarding Sterling's competency. Though Sterling's post-trial counsel suggested that Sterling had delusional thoughts and an inability to understand the severity of the proceedings and "why punishment would be administered in this case," there was ample basis for the district court to find that Sterling was able to understand the nature of the proceedings and consequences before him. Given its superior position for observing and evaluating Sterling, the district court's determination of Sterling's competence does not therefore constitute an abuse of discretion.

## III.

For the foregoing reasons, we AFFIRM the district court on all issues.